PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO, demandante y apelante, *v.* COMISIÓN ESTATAL DE ELECCIONES y OTROS, demandados y apelados; ESTADO LIBRE ASOCIADO DE PUERTO RICO, COMITÉ PRO CANDIDATURA DE ROBERT DOLE, interventores.

*Número:* CE-88-62 *Resuelto:* 7 de marzo de 1988

---

*Luis Rivera Lacourt, José Juan Nazario De la Rosa, Juan Santiago Nieves, Armando De León Vargas,* de *Nazario, Santiago & De León,* abogados del apelante; *Julia M. Santiago De la Cruz,* abogada de la Comisión Estatal de Elecciones, apelada; *Alex González, Alberto Pérez Hernández,* de *González & Pérez Hernández, Walter H. Muñiz* y *Gerardo A. Carlo,* de *Carlo & Dubos,* abogados de Marlene I. Gillette y Carlos Canals Mora,

apelados; *Nicolás Gautier, Luis Sánchez Betances* y *Miguel P. Cancio Bigas,* de *Sánchez, Betances & Sifre,* abogados de Eudaldo Báez Galib y René Muñoz Padín, apelados; *Marcos A. Ramírez Irizarry,* de *Ramírez & Ramírez,* abogado del Estado Libre Asociado representado por el Secretario de Justicia, interventor.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Nos enfrentamos de nuevo a un asunto anteriormente examinado por este Foro: la validez del uso de fondos públicos para reglamentar la celebración de primarias presidenciales en Puerto Rico. *P.S.P.* v. *E.L.A.,* 107 D.P.R. 590 (1978); *P.I.P.* v. *E.L.A.,* 109 D.P.R. 403 (1980). En su aspecto ideológico, reconocemos que se trata de un problema complejo de ardua solución que provoca intensas y conflictivas emociones y expresiones de tipo político-partidista. Bajo la óptica jurídica, resolvemos que el proceso eleccionario de primarias presidenciales que autoriza y reglamenta la Ley Núm. 6 de 24 de septiembre de 1979, según enmendada, 16 L.P.R.A. sec. 1321 *et seq.,* tiene un fin público, por lo que es válida la asignación de recursos del Estado para sufragar la celebración de dicho evento. Resolvemos, además, que la referida ley no infringe el Art. II, Sec. 19 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, relativo a los derechos pertenecientes al pueblo ni vulnera las Secs. 1 y 7 de la misma. Confirmamos al Tribunal Superior en todos los extremos.

I

La constelación de intereses en conflicto nos exige una rigurosa fijación de hechos y antecedentes procesales.

El 4 de diciembre de 1987 el Partido Independentista Puertorriqueño (en adelante P.I.P.) presentó demanda en el Tribunal Superior, Sala de San Juan, en solicitud de entredi-

cho provisional e interdicto preliminar y permanente contra, entre otros demandados apelados, la Comisión Estatal de Elecciones (en adelante Comisión Estatal), para impedir el uso de fondos públicos, funcionarios, personal, materiales, equipo o facilidades en cualquier actividad relacionada con la organización y celebración de las primarias presidenciales que autoriza la Ley Núm. 6, *supra*, o "Ley de Primarias Presidenciales Compulsorias".(1)

Alegó el P.I.P. que la participación de la Comisión Estatal en dicho evento pautado para el 20 de marzo de 1988 violaba disposiciones de la Constitución del Estado Libre Asociado, en particular el Art. VI, Sec. 9, que afirma que "[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". L.P.R.A., Tomo 1, ed. 1982, pág. 369. Adujo, igualmente, que la planificación y organización de las primarias constituía una violación "a los derechos reservados por el pueblo puertorriqueño en cuanto al status y destino político final de nuestro país ... ", así como "*discrimina* contra aquellos sectores políticos opuestos a la integración de Puerto Rico a los Estados Unidos de América del Norte ... ". (Énfasis del original.) Apéndice, pág. 43.

---

(1) También fueron demandados Marcos A. Rodríguez Estrada, Presidente de la Comisión Estatal de Elecciones del Estado Libre Asociado de Puerto Rico; Hiram Meléndez Rivera, Comisionado Electoral del Partido Independentista Puertorriqueño; Eudaldo Báez Galib, Comisionado Electoral del Partido Popular Democrático y Representante Electoral del Partido Demócrata de Estados Unidos en Puerto Rico; Carlos Canals Mora, Comisionado Electoral del Partido Nuevo Progresista y Representante Electoral del Partido Demócrata de Estados Unidos en Puerto Rico y Orestes Ramos, Representante Electoral del Partido Republicano de Estados Unidos en Puerto Rico. Según surge de los autos originales remitidos, el licenciado Orestes Ramos fue emplazado. Sin embargo, cuestionada por el propio P.I.P. en la conferencia con antelación a la vista de *injunction* preliminar la capacidad legal del licenciado Orestes Ramos para representar al Partido Republicano, todas las partes acordaron su exclusión.

Después del diligenciamiento de los correspondientes emplazamientos, el Tribunal Superior declaró sin lugar la solicitud de entredicho provisional, señalando en su lugar una conferencia con antelación a la vista de *injunction* preliminar para el 15 de diciembre. Ese día, el Estado Libre Asociado (E.L.A.), representado por el Secretario de Justicia a través de sus abogados, solicitó permiso para intervenir en el pleito a tenor con lo dispuesto en la Regla 21.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Invocó su derecho a defender la validez constitucional de las leyes, a la vez que negó que la Ley Núm. 6, *supra*, adoleciera de vicio constitucional. En el mismo acto, solicitó la exclusión de la Comisión Estatal, así como de los Comisionados Electorales de los partidos locales por entender que la administración, organización y dirección de las primarias presidenciales había sido encomendada por ley exclusivamente al Presidente de la Comisión Estatal y a los Representantes Electorales de los partidos afiliados, y no a los Comisionados en tal capacidad, o a la Comisión Estatal como entidad.

El tribunal, sin oposición de las partes, permitió la intervención del E.L.A. en el litigio y del Comité Pro Candidatura de Robert Dole. En vista de que el demandante apelante mostró objeción a la exclusión de partes, el foro primario le concedió dos (2) días de término para exponer su posición por escrito. Se acordó estipular los hechos esenciales y consolidar, con la anuencia del tribunal, las solicitudes de *injunction* preliminar y permanente. Por último, a base de lo discutido en cámara, el tribunal permitió una enmienda a la demanda a los fines de incluir como partes adicionales a los presidentes de los partidos Republicano y Demócrata de Puerto Rico.[2]

---

[2] Luis A. Ferré Aguayo, Marlene Gillette y Alfonso López Chaar. En enero René Muñoz Padín sustituyó a Alfonso López Chaar, quien fue nombrado Secretario Interino del Departamento de Estado.

Diligenciados los nuevos emplazamientos, continuó la vista en cámara el 22 de diciembre. La controversia quedó exclusivamente limitada a la constitucionalidad de la utilización de fondos públicos por la Comisión Estatal para las funciones señaladas en la demanda. En el ínterin, el 28 de diciembre, el tribunal declaró sin lugar la solicitud de exclusión de partes formulada por el E.L.A. Entendió la ilustrada sala que éstas tenían "un interés común suficiente en este litigio y que podrían ser obligadas por la sentencia que se dicte", por lo que consideró prudente mantenerlos como sujetos del proceso. Apéndice, pág. 113.

Tres días después, el P.I.P. presentó una solicitud de sentencia sumaria y memorando de derecho en apoyo a la expedición del interdicto permanente. En esencia revivió las controversias y polémicas centrales ya suscitadas en *P.S.P.* v. *E.L.A.*, supra, y *P.I.P.* v. *E.L.A.*, supra. Como materia nueva a la estipulada en la reunión en cámara, el P.I.P. acompañó prueba documental acreditativa, a su entender, de la participación de la Comisión Estatal en unas "elecciones internas" del Partido Demócrata de Puerto Rico a celebrarse conjuntamente con las primarias presidenciales.

El E.L.A. presentó alegato en oposición el mismo día. Formuló defensas procesales y argumentó a favor de la constitucionalidad de la Ley Núm. 6, *supra*. Por su parte, los codemandados apelados Marlene Gillette y Carlos Canals Mora se hicieron eco del planteamiento del P.I.P. en el sentido de que el Partido Demócrata de Puerto Rico celebraría "elecciones internas" conjuntas con las primarias. Apoyaron la constitucionalidad del uso de fondos públicos para sufragar las primarias presidenciales, siempre y cuando éstas se mantuviesen separadas de cualquier "elección interna" del Partido Demócrata en Puerto Rico. El codemandado apelado Luis A. Ferré, por su parte, presentó una moción de dos (2) páginas en defensa de la medida, en la cual expresó que se

reafirmaba en los fundamentos planteados en las otras comparecencias y pidió que se le relevara de tener que presentar memorando.

El 7 de enero el E.L.A. negó que la Comisión Estatal tuviese vinculación formal con los procesos internos del Partido Demócrata en Puerto Rico. El interventor Comité Pro Candidatura de Robert Dole presentó moción en favor de la ley y los codemandados apelados Eudaldo Báez Galib, Comisionado Electoral del P.P.D. y el Sr. René Muñoz Padín, copresidente del Partido Demócrata de Puerto Rico, también comparecieron para defender la constitucionalidad del gasto impugnado. Adujeron que el concepto de fin público debía evaluarse a la luz de consideraciones contemporáneas y con gran deferencia al juicio legislativo.

Así trabada la contienda, el 21 de enero recayó la sentencia que origina el recurso. A base de los hechos estipulados el foro de instancia analizó meticulosamente las controversias planteadas.

Dispuso en primer lugar de la defensa de cosa juzgada promovida por el E.L.A. Argüía el Estado que el caso *P.I.P.* v. *E.L.A.*, supra, impedía que nuevamente el P.I.P. impugnara la constitucionalidad del uso de fondos públicos para sufragar las primarias presidenciales autorizadas por la Ley Núm. 6, *supra*. Estimó el ilustrado tribunal de instancia que en efecto la pretensión del demandante apelante en el presente caso ya había sido juzgada, lo que impedía una apertura del nuevo proceso. Opinó, sin embargo, que estaban presentes en este caso "consideraciones de interés público, justicia y razonabilidad" que hacían inaplicable la doctrina de cosa juzgada. Apéndice, pág. 13.

Después de un cuidadoso estudio de la Ley de Primarias Presidenciales Compulsorias de 1979, el foro de instancia concluyó que el propósito primordial de la ley era "proveer un sistema racional y seguro que viabilice la participación de

los puertorriqueños que lo deseen en las primarias de los partidos políticos de los Estados Unidos a que estén afiliados", y así "asegurar la paz y tranquilidad en dicho proceso". (Énfasis suprimido.) Apéndice, pág. 21.

Contrario a lo sostenido por el P.I.P., el Tribunal Superior concluyó que "[l]a ley impugnada no ofrece fondos de campaña ni otros recursos públicos a entidad privada alguna, ni provee para la intervención del Estado en elecciones de funcionarios de los partidos". Apéndice, pág. 22. Además, indicó que esta ley "s[ó]lo reglamenta la actividad [electoral] y pone los servicios del Presidente de la Comisión Estatal de Elecciones, sus funcionarios, equipo y materiales para darle la formalidad de un proceso oficial a dicha actividad". Íd., pág. 22.

Examinados tanto los propósitos como la amplia reglamentación del proceso, el Tribunal Superior resolvió que era "imposible no reconocer el interés y fin público que esta legislación tiene, aun cuando dicha actividad eleccionaria no le interese a un número de puertorriqueños". Apéndice, pág. 23.

Por otro lado, en su extensa y fundamentada sentencia el magistrado también analizó el señalamiento de inconstitucionalidad de la Ley de Primarias Presidenciales Compulsorias, por ser ésta incompatible con la reserva de poder sobre el destino político final que hizo el Pueblo de Puerto Rico al aprobar la Constitución. Concluyó lo siguiente:

. . . Es un principio que nadie puede cuestionar . . . que nuestra Constitución dejó en manos del Pueblo de Puerto Rico directamente la decisión de su destino político final y la aprobación de medidas que afecten sus relaciones con los Estados Unidos y que la Asamblea Legislativa no tiene facultad para legislar en tales áreas reservadas [al] Pueblo. *P.S.P.* v. *E.L.A.*, supra. Consideramos, sin embargo, que la reglamentación y la participación del Estado en las Primarias Presidenciales ni la participación de un número, aun sustancial de

puertorriqueños en dichas primarias, constituye un cambio en las relaciones políticas entre Puerto Rico y Estados Unidos ni en el status de Puerto Rico.

. . . . . . . .

Consideramos que la reserva de derechos del pueblo en esta área se refiere a cambios en la relación jurídica entre los Estados Unidos y Puerto Rico. Nos parece evidente que la participación voluntaria de un número de Puertorriqueños en los procesos electorales de los Estados Unidos en el pasado, con la intervención del Estado, o sin ella, no ha cambiado dicha relación jurídica. Apéndice, págs. 25–26.

Finalmente, el tribunal resolvió que la legislación no es contraria a la Cláusula de Igual Protección de las Leyes, porque no establece ninguna clasificación ni afecta un derecho fundamental.

Inconforme con la sentencia, el P.I.P. presentó escrito de apelación ante este Foro el 3 de febrero de 1988, y simultáneamente solicitó que en auxilio de nuestra jurisdicción dictáramos un *injunction* que paralizara los efectos de la misma y que ordenara al Presidente de la Comisión Estatal que se abstuviera de utilizar fondos y recursos públicos en la preparación de las primarias, hasta tanto el Tribunal resolviera en los méritos la apelación.

Consciente del carácter apremiante del recurso, emitimos el pasado 5 de febrero de 1988, la resolución siguiente:

A los fines de evaluar y disponer sobre la procedencia de la moción en auxilio de jurisdicción y los méritos del recurso instado por el Partido Independentista Puertorriqueño, y en vista de la naturaleza urgente del asunto, se le concede a todos los demandados recurridos un término final y simultáneo a vencer el martes 16 de febrero de 1988, 12:00 mediodía, para someter sus posiciones y alegatos pertinentes.

Las partes han comparecido y estamos en condición de resolver la apelación.

## II

La controversia ante nos ha sido elevada a este Foro en dos ocasiones anteriores y fue objeto de extenso análisis por este Tribunal en opiniones suscritas por casi todos los jueces que participaron en las mismas.(3) En *P.S.P.* v. *E.L.A.*, supra, declaramos inconstitucional la Ley de Primarias Presidenciales Compulsorias de 1977, Ley Núm. 102 de 24 de junio de 1977, por ser contraria al Art. VI, Sec. 9 de la Constitución del Estado Libre Asociado, *supra*. Con posterioridad a esa decisión la Asamblea Legislativa de Puerto Rico promulgó una nueva Ley de Primarias Presidenciales Compulsorias, Ley Núm. 6, *supra*, e incorporó unas enmiendas en octubre de 1983, marzo de 1984 y julio de 1987.

Con la nueva ley de 1979 la Asamblea Legislativa introdujo cambios significativos con "el propósito de establecer un nuevo ordenamiento para regir todo lo concerniente a la celebración en la Isla de procesos electorales para seleccionar los Delegados Puertorriqueños a las convenciones nominadoras de los Partidos Nacionales ... [y para] garantizar su más eficaz instrumentación y más garantías de pureza e igualdad ..." de modo que "tales eventos electorales se [lleven a cabo] dentro de un clima de paz y orden social". Informe sobre el sustitutivo al P. de la C. 1198 de la Comisión de Gobierno de la Cámara de Representantes, de 25 de

---

(3) En *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1987), la opinión del Tribunal fue emitida por el Juez Presidente Señor Trías Monge. El Juez Asociado Señor Negrón García emitió opinión concurrente. Los Jueces Asociados Señores Dávila y Martín suscribieron votos disidentes. En *P.I.P.* v. *E.L.A.*, 109 D.P.R. 403 (1980), el Juez Asociado Señor Dávila emitió una opinión a la cual se unieron los Jueces Asociados Señores Martín, Díaz Cruz e Irizarry Yunqué. Los Jueces Asociados Señores Martín y Díaz Cruz emitieron opiniones particulares conformes y el Juez Asociado Señor Negrón García suscribió opinión disidente a la cual se unió el Juez Asociado Señor Torres Rigual. El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Rigau hubiesen confirmado la sentencia apelada y se reservaron el derecho a expresar sus criterios por escrito.

agosto de 1979. XXXIII (13) Diario de Sesiones de la Asamblea Legislativa (Senado) 173 (1979).

El legislador explicó cuidadosamente sus propósitos públicos en la Exposición de Motivos:

> Es de conocimiento general el interés que han demostrado nuestros ciudadanos de participar activamente en el proceso de nominación de los candidatos de los distintos partidos políticos nacionales a[u]n dentro de las limitaciones del actual marco jurídico político de Puerto Rico. Ello se ha hecho evidente a través de los años, ya que hace décadas que distinguidos puertorriqueños vienen participando en representación de Puerto Rico como delegados en las convenciones nominadoras de los partidos nacionales.
>
> ... El propósito principal de la presente ley, al igual que lo fue el de su legislación antecesora, es el de proveer un sistema racional y seguro que viabilice las manifiestas ansias de nuestros ciudadanos de participar activamente en los procesos de selección de los delegados puertorriqueños que participan en las convenciones nominadoras de los partidos nacionales, así como en los procesos internos de dichos partidos, como es el de redactar la plataforma de cada partido nacional que eventualmente pueda constituirse en el programa de gobierno de la nación. Existe en el votante un legítimo interés de seleccionar libremente las personas que habrán de representarle en la confección del programa de gobierno de cada Partido Nacional.
>
> Debido a las relaciones constitucionales existentes entre Puerto Rico y el Gobierno Federal de los Estados Unidos se aplican a la isla numerosos actos de gobierno llevados a cabo por las tres ramas del Gobierno Federal de los Estados Unidos. De hecho, las actuaciones gubernamentales tienen su origen conceptual en las plataformas de los Partidos Nacionales, las cuales se redactan y aprueban en dichas Convenciones, por lo que resulta de interés público el garantizar la participación de los puertorriqueños en dichas Convenciones Nacionales.
>
> El sistema llamado de "caucus" o asambleas de distrito utilizado hasta 1976 demostró ser peligroso, ya que varios actos de violencia ocurrieron en cada una de las ocho actividades

celebradas en los distritos senatoriales. La Asamblea Legislativa de Puerto Rico, y especialmente las Comisiones de Gobierno de ambos Cuerpos, han tenido ante sí evidencia contundente de la ocurrencia de estos actos de violencia. También han tenido ante sí evidencia concluyente de que dicho sistema de "caucus" o asambleas multitudinarias para la selección de los Delegados Nacionales, propicia el que se coarten o se trate de coartar el ejercicio de la libertad de expresión y de la libertad de asociación política. No puede haber nada más contrario al sentido de serenidad y al ejercicio de los dictados de la libertad de conciencia que requiere el proceso del sufragio, que la violencia y la intimidación. Asimismo, difícilmente existe un interés público de mayor envergadura que el de proveerle a los ciudadanos suficientes garantías de que podrán ejercer el derecho al sufragio y las libertades de expresión y de asociación política protegidas por las dos constituciones que nos amparan, y que han ejercido numerosos puertorriqueños al identificarse con los partidos políticos nacionales, y de considerarse a sí mismos y desear ser conocidos como afiliados a éstos, sin riesgo para su cuerpo y su conciencia. La paz social es el mayor interés público que pueda tener al gobierno de un estado civilizado.

La aprobación de esta ley, como lo requirió su antecesora, probablemente demande la erogación de fondos públicos para poner en vigor los altos propósitos de participación democrática y paz social que la inspiran.

El Artículo VI de la Sección 9 de la Constitución de Puerto Rico expresa: "sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del estado y en todo caso por autoridad de ley". La Asamblea Legislativa de Puerto Rico, al aprobar esta legislación, provee con ella la autoridad de ley necesaria, para que, en su día, se autorice la erogación de fondos públicos y la utilización de las propiedades del pueblo necesarias para dar cumplimiento cabal al fin e interés públicos que quedan expresados en los párrafos que preceden.

Cabe destacar que la Oficina del Administrador General de Elecciones es una institución del Estado.

La "expresión y declaración legislativa" que hace esta Asamblea Legislativa ahora es que es [sic] la política pública

del Pueblo de Puerto Rico, asegurarle a los puertorriqueños el ejercicio de los derechos constitucionales, que anteriormente se han mencionado, con seguridad para su integridad física y de conciencia y en un ambiente de paz social. Ese, repetimos, es el mayor fin público concebible, porque constituye el propósito mismo de la vida civilizada. Como reza nuestra Constitución: la dignidad del ser humano es inviolable.

Es política pública del Pueblo de Puerto Rico la de [sic] que corresponde exclusivamente a las mayorías electorales puertorriqueñas el tomar cualquier decisión que estimen propicia con relación al destino político de Puerto Rico mediante su expresión en un proceso plebiscitario que deberá llevarse a cabo separadamente de las Elecciones Generales de Puerto Rico y, por supuesto, separadamente también del proceso de primarias, sean éstas relativas a los partidos políticos locales o a los partidos políticos nacionales.

Por otro lado, consideramos que dado el hecho histórico de la existencia en Puerto Rico de filiales de Partidos Nacionales, es requisito esencial el de [sic] que cualquier partido político afiliado, para gozar de tal condición cuente con el reconocimiento del Partido Nacional de que se trate. Esta ley, no obstante liberalizar[,] en cierta medida, los requisitos de inscripción de los partidos políticos afiliados, mantiene l[os] mism[os], con el rigor necesario, para asegurar que no se vulnere la buena fe de los Partidos Nacionales. Por ello, se hace mandatorio el que las peticiones de inscripción de los partidos políticos afiliados sean debidamente suscritas ante Notarios Públicos Autorizados. Diario de Sesiones de la Asamblea Legislativa, *supra*, pág. 168.

Al derogar la ley anterior y promulgar una nueva Ley Electoral para regir el proceso, la Asamblea Legislativa reconoció y respetó nuestra decisión en *P.S.P.* v. *E.L.A.*, supra. El nuevo ordenamiento electoral cambió totalmente los aspectos operacionales del sistema de votación, incluso el ámbito jurisdiccional del Estado en la reglamentación de las actividades de los partidos afiliados, la naturaleza y forma de la reglamentación, el proceso de votación, escrutinio, y los

controles sobre las contribuciones, ingresos y gastos de los partidos políticos afiliados.

El mismo ordenamiento establece unos requisitos para la inscripción de "partidos políticos afiliados" a un "partido nacional" y un procedimiento para la celebración de primarias presidenciales, de modo que los electores expresen sus preferencias en cuanto a los candidatos a ser nominados por los "partidos nacionales" que tengan un "partido político afiliado". 16 L.P.R.A. sec. 1323. Además, dispone la celebración de primarias el tercer domingo de marzo del año electoral correspondiente, 16 L.P.R.A. sec. 1324; reglamenta la nominación de candidatos, 16 L.P.R.A. sec. 1338; establece un sistema de votación para este evento electoral, 16 L.P.R.A. sec. 1333, incluso el método de identificación de los electores, íd.; las papeletas de votación, 16 L.P.R.A. sec. 1340; el proceso de votación, 16 L.P.R.A. sec. 1343, y el escrutinio de las papeletas, 16 L.P.R.A. sec. 1344.

El estatuto delega en el Presidente de la Comisión Estatal amplias facultades para coordinar y supervisar el proceso electoral y adoptar las normas y reglamentos necesarios para "implementar" la ley. 16 L.P.R.A. sec. 1346. También concede al presidente jurisdicción sobre la inscripción de los partidos políticos afiliados, 16 L.P.R.A. sec. 1353, y reglamenta la contribución de cualquier persona natural o jurídica a los partidos afiliados, candidatos a delegados, comités políticos u otra organización. 16 L.P.R.A. sec. 1349. También provee para que los partidos, candidatos a delegados y otras agrupaciones relacionadas estén sujetas a las disposiciones de la Ley Electoral referentes a la contabilidad e informes de ingresos y gastos. 16 L.P.R.A. sec. 1349.

Mientras que bajo la anterior legislación el Tribunal Electoral podía intervenir en cualquier elección interna de funcionarios u oficiales del partido nacional afiliado, la nueva ley circunscribe la jurisdicción de la Comisión Estatal única

y exclusivamente a la rigurosa reglamentación de las actividades descritas anteriormente.

Finalmente, en consideración a nuestra decisión en *P.S.P.* v. *E.L.A.*, supra, la Asamblea Legislativa incluyó el pronunciamiento citado más adelante, sobre la interpretación de los resultados de las primarias, y vedó así formalmente toda posible vinculación oficial por parte del Estado entre los resultados de las primarias y la relación jurídica entre Puerto Rico y Estados Unidos:

> Siempre que los procedimientos de primarias presidenciales sean administrados e implementados desde su inicio hasta cumplimentación final por el Presidente de la Comisión Estatal de Elecciones, ni el número de los participantes, ni los resultados de ningún otro elemento del proceso de las mismas y/o demás procedimientos que se lleven a tenor con lo dispuesto en este Capítulo podrá ser oficialmente interpretado por el Gobierno de Puerto Rico para propósito alguno como indicador en relación con las preferencias que tenga o pueda tener nuestro pueblo o un sector del mismo en cuanto al asunto del status político, ni en cuanto a la dirección, si alguna, por la cual deba o pueda encaminarse Puerto Rico en términos de cambios a su actual status. 16 L.P.R.A. sec. 1352.

Para refrendar la importancia de este artículo, uno de los coautores de la ley explicó su alcance:

> El Tribunal Supremo de Puerto Rico resolvió en el 1978, en un caso llevado por el Partido Socialista ante ese alto Tribunal después de pasar por los demás tribunales de Puerto Rico, que no se pueden [*sic*] mediante acción legislativa encaminar al pueblo de Puerto Rico por una senda particular de [*status*] y, precisamente, esa expresión del Tribunal Supremo, es la que recoge el Artículo 32 de esta legislación que hoy discutimos aquí. Bien claramente se establece en ese artículo, que no podrá interpretarse el resultado de esa primaria presidencial, de ninguna de las primarias presidenciales de los dos (2) partidos como índice con relación a la voluntad del pueblo de Puerto Rico sobre cuál ha de ser su futuro político final. Siempre y cuando, naturalmente, que sea una institución del Es-

tado, como en este caso lo es la oficina del Administrador General de Elecciones, quien rija el proceso desde principio hasta el final. . . . [L]o que hace esta legislación es expresar claramente la política pública del pueblo de Puerto Rico, del Gobierno de Puerto Rico, como instrumento de la sociedad puertorriqueña en el sentido de que corresponde a las masas de este país, expresándose libremente en su día mediante un proceso plebiscitario, cuál haya de ser el destino político de Puerto Rico. XXXIII(1) Diario de Sesiones de la Asamblea Legislativa, *supra*, págs. 14–15.

Independientemente de las opiniones que se puedan difundir sobre las primarias presidenciales, de la descripción anterior se desprende que la ley en controversia complementa la Ley Electoral vigente y reglamenta escrupulosamente unos comicios de importancia para un número significativo de puertorriqueños, a la vez que taxativamente afirma que los resultados no pueden ser interpretados por el Estado para alterar o propiciar cambios en la relación jurídico-política entre Estados Unidos y Puerto Rico.

Después de la aprobación de esta ley, el P.I.P. solicitó y obtuvo del Tribunal Superior un interdicto dirigido al Administrador General de Elecciones y al Secretario de Hacienda que prohibía el uso de propiedades y fondos públicos en la celebración de las primarias presidenciales que se celebraron en 1980. Por estar dividido el Tribunal, ante la norma constitucional que establece que sólo por mayoría absoluta del mismo se decretará inconstitucional una ley, revocamos la sentencia del foro de instancia sin opinión del Tribunal. Esta decisión tuvo "el efecto de reintegrarle la característica de constitucionalidad" a la asignación de fondos para sufragar las primarias presidenciales bajo la Ley Núm. 6, *supra*. *P.I.P.* v. *E.L.A.*, supra, pág. 417.

Aunque no hubo una opinión del Tribunal, sus miembros emitieron múltiples ponencias que expresaban sus respectivas posiciones. Entre éstas, la única que obtuvo el endoso

de una pluralidad de Jueces —cuatro de los Jueces se unieron a ella— fue la del Juez Asociado Señor Dávila. Sus pronunciamientos son particularmente relevantes en esta segunda ocasión en que el P.I.P. cuestiona la constitucionalidad de la misma ley allí impugnada. En su opinión el Juez Asociado Señor Dávila examinó la nueva legislación y reconoció que al aprobarla la Asamblea Legislativa actuó tomando en consideración los pronunciamientos de este Tribunal en *P.S.P.* v. *E.L.A.*, supra, y por lo tanto concluyó:

> La asignación de fondos públicos para la celebración de las primarias presidenciales no contraviene lo dispuesto en la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico. Ciertamente es un fin público canalizar la expresión de los votantes puertorriqueños para la selección de los delegados que participan en las convenciones a celebrarse por los partidos políticos nacionales para seleccionar los dos candidatos a la primera magistratura de la nación americana, de suerte que no puede impugnarse como fraudulento el proceso mediante el cual se seleccionan. Esa es la voluntad expresada por la mayoría de los funcionarios electos por el público y que participan en la aprobación de una pieza legislativa. *P.I.P.* v. *E.L.A.*, supra, pág. 409.

Examinados los acontecimientos de la última década que evidencian un marcado interés de un número significativo de personas en participar en estas primarias presidenciales, y conscientes de la deferencia que merece la decisión de otra rama en nuestro sistema republicano de gobierno, hoy reafirmamos estos pronunciamientos.

## III

El P.I.P. señala cuatro (4) errores. La tesis de los primeros tres (3) parece ser la siguiente: la utilización de fondos públicos en las primarias presidenciales constituye una "malversación" de recursos, a la vez que constituye un subsidio indirecto a una agrupación que no es un partido político

local. Argumenta, por último, que la plataforma política de los partidos demandados es contraria al ideal independentista, por lo que no hay un objetivo general de pueblo en las primarias.

El cuarto error señalado expresa la sustancia conflictiva del pleito. Argumenta el P.I.P. que erró el tribunal al dictaminar que la Ley de Primarias Presidenciales Compulsorias:

1. No contraviene la prohibición de que se utilicen propiedades o fondos públicos para fines sectarios.
2. No constituye una invasión de derechos pertenecientes al pueblo de Puerto Rico sobre su destino político y *status* final.
3. No viola la cláusula de igual protección de las leyes de la Constitución del Estado Libre Asociado de Puerto Rico.

Por su parte, la posición del E.L.A. es que el proceso eleccionario de primarias presidenciales que autoriza y reglamenta la Ley Núm. 6, *supra*, tiene el fin público de asegurar un sistema de votación racional, seguro y confiable que permita que dichos procesos se lleven a cabo con la seguridad y paz necesarias. Para la "implementación" de tal fin se pueden utilizar fondos públicos de acuerdo con el Art. VI, Sec. 9 de la Constitución, *supra*. En su alegato, el Estado traza la historia y evolución de las agrupaciones políticas interesadas en vincularse a los partidos norteamericanos, y concluye que la inversión de fondos públicos en mantener el esquema electoral de Puerto Rico no impide que la Legislatura asigne fondos públicos a la Comisión Estatal para reglamentar y supervisar las primarias presidenciales.

■ Examinemos primeramente una cuestión de orden procesal. Como expresáramos, el Tribunal Superior resolvió que aunque *P.I.P.* v. *E.L.A.*, supra, constituía cosa juzgada para efectos del presente caso, no debía aplicar la doctrina por razones de interés público. Actuó correctamente el tribunal a quo.

■ Bajo un análisis rigurosamente civilista estaban presentes las identidades procesales necesarias para que prosperara la defensa.(4) Ciertamente se cumplía el primer requisito, esto es, identidad de cosa u objeto. La cosa es el "objeto o materia sobre la cual se ejercita la acción". *Lausell Marxuach* v. *Díaz de Yáñez*, 103 D.P.R. 533, 535 (1975). Sólo la parte dispositiva de la sentencia pasa en autoridad de cosa juzgada al nuevo proceso. O sea, la declaración de que existe o no existe el derecho. E. Gómez Orbaneja, *Derecho Procesal Civil*, 7ma ed., Madrid, Artes Gráficas y Ediciones, 1975, Vol. 1, pág. 401.

La cosa o el objeto en el presente pleito es exactamente el mismo que fue tema del primer pronunciamiento en *P.I.P.* v. *E.L.A.*, supra. Es decir, la constitucionalidad de la utilización de fondos públicos para llevar a cabo las primarias presidenciales autorizadas por la Ley Núm. 6, *supra*, según enmendada.

También está presente el requisito de identidad de causa. En *A & P Gen. Contractors* v. *Asoc. Caná*, 110 D.P.R. 753, 765 (1981), definimos la causa como "el motivo de pedir" o el "fundamento capital, el origen de las acciones". En este caso el P.I.P. solicita un interdicto para que se prohíba el uso de fondos en la celebración de las primarias presidenciales que

---

(4) El Art. 1204 del Código Civil, 31 L.P.R.A. sec. 3343, dispone en lo pertinente:

"Contra la presunción de que la cosa juzgada es verdad, sólo será eficaz la sentencia ganada en juicio de revisión.

"Para que la presunción de cosa juzgada surta efecto en otro juicio, es necesario que entre el caso resuelto por la sentencia y aquel en que ésta sea invocada, concurra la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad en que lo fueron.

. . . . . . . .

"Se entiende que hay identidad de personas siempre que los litigantes del segundo pleito sean causahabientes de los que contendieron en el pleito anterior, o estén unidos a ellos por vínculos de solidaridad o por los que establece la indivisibilidad de las prestaciones entre los que tienen derecho a exigirlas u obligación de satisfacerlas."

autoriza la Ley Núm. 6, *supra*, sobre la base de que tal uso infringe el Art. VI, Sec. 9 de la Constitución, *supra*. Idéntica alegación y pedimento contiene la demanda en el caso de autos.

■ Igualmente hay identidad de personas y legitimación. No hay controversia sobre que el demandante apelante en ambos pleitos, el P.I.P., es jurídicamente hoy el mismo que ayer. El hecho de que su Presidente Rubén Berríos Martínez representara al P.I.P. en el pleito anterior no es decisivo, ya que allí compareció como una parte nominal. *Mercado Riera* v. *Mercado Riera*, 100 D.P.R. 940, 949 (1972). En el pasado hemos adoptado un enfoque pragmático en la interpretación del requisito de identidad de partes para propósitos de la doctrina de cosa juzgada. Véase *Pol Sella* v. *Lugo Christian*, 107 D.P.R. 540, 549 (1978). También hemos utilizado el concepto de "parte realmente interesada". El Estado Libre Asociado es la parte con verdadero interés en este pleito en defender la constitucionalidad del uso de fondos públicos para sufragar las primarias presidenciales autorizadas por la Ley Núm. 6, *supra*. No se quebranta dicha identidad porque en el lado pasivo de la demanda hoy figuren litigantes que no fueron parte en el primer pleito. *González* v. *Méndez et al.*, 15 D.P.R. 701, 718 (1909); *De León* v. *Colón*, 42 D.P.R. 22, 28 (1931); L. Prieto-Castro, *Tratado de Derecho Procesal Civil*, 2da ed. rev., Pamplona, Ed. Aranzadi, 1985, T. 1, pág. 800 *et seq.*

■ Por último, aunque la sentencia en *P.I.P.* v. *E.L.A.*, supra, fuera dictada por un tribunal dividido, la misma es final y concluyente entre las partes, por lo que constituye cosa juzgada en este pleito. *Junta Insular de Elecciones* v. *Corte*, 63 D.P.R. 819, 832–835 (1944).

No obstante lo anterior, en el pasado hemos reconocido límites a la doctrina, especialmente en aquellos casos que

están permeados de consideraciones de orden público. *Pérez v. Bauzá*, 83 D.P.R. 220 (1961); *Millán v. Caribe Motors Corp.*, 83 D.P.R. 494 (1961); *Suárez Fuentes v. Tribunal Superior*, 88 D.P.R. 136, 151 (1963); *Feliciano Ruiz v. Alfonso Develop. Corp.*, 96 D.P.R. 108 (1968). Es de incuestionable interés público que este Tribunal pase juicio sobre la constitucionalidad de la nueva Ley de Primarias Presidenciales Compulsorias. Ante las circunstancias específicas que produjeron la decisión de *P.I.P. v. E.L.A.*, supra, y el hecho de que esta situación es capaz de repetirse, resolvemos que se sirven mejor los fines de la justicia si no aplicamos la doctrina de cosa juzgada a este caso. El Tribunal Superior, animado igualmente por consideraciones eminentemente prácticas, declaró sin lugar la defensa. Confirmamos su actuación.

### IV

El Art. VI, Sec. 9 de la Constitución del Estado Libre Asociado, *supra*, ordena:

> Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley.

El texto no es nada enigmático. Estaba previsto, en su esencia, por el sistema Foraker de 1900 y la Ley Jones de 1917. *P.S.P. v. E.L.A.*, supra, pág. 536. La Constitución de 1952 completa, sin duda, esta evolución.

Bajo diversos calificativos (interés, utilidad, etc.) la noción de finalidad pública juega un papel importante en nuestro ordenamiento jurídico. A diferencia de los particulares quienes, siempre que sea lícito, pueden actuar para los fines más variados, la búsqueda de un fin de interés público es la condición positiva de toda actuación estatal. El interés público no es simplemente la *suma* de los intereses particulares. Tampoco es en esencia distinto al interés de las per-

sonas o los grupos que componen el país. Resulta en la mayoría de las ocasiones del acomodo entre los diversos intereses particulares.

Unas veces el interés público es el del grupo más numeroso. Por ejemplo, la expropiación forzosa (Art. II, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1)(5) que tiene por objeto permitir el paso de una carretera, sin duda sacrifica el interés del propietario para beneficio de los muchos usuarios de la vía. Otras veces, el fin público se define no cuantitativamente, sino cualitativamente. Los enfermos, indigentes o impedidos no constituyen el grupo más numeroso de la población, pero el valor de la salud y la vida humana se impone a los intereses pecuniarios del conjunto de la población y muy bien explica la creación de programas de bienestar público a costa de los contribuyentes.

 El gobierno en el Estado moderno tiene que ser un ente activo y creador. La naturaleza cambiante de la función legislativa justifica que este cuerpo cuente con los instrumentos necesarios para encarar exitosamente los retos de la vida moderna. Por ser las Asambleas Legislativas de los Estados democráticos los cuerpos donde maduran y toman forma las fuerzas sociales latentes u operantes, y donde sólo es posible definir con la necesaria precisión la mayor parte de los elementos que componen y constituyen el llamado fin o

---

(5) *"Sec. 9. [Justa compensación por propiedad privada]*

"No se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley. No se aprobará ley alguna autorizando a expropiar imprentas, maquinarias o material dedicados a publicaciones de cualquier índole. Los edificios donde se encuentren instaladas sólo podrán expropiarse previa declaración judicial de necesidad y utilidad públicas mediante procedimientos que fijará la Ley, y sólo podrán tomarse antes de la declaración judicial, cuando se provea para la publicación un local adecuado en el cual pueda instalarse y continuar operando por un tiempo razonable." Art. II, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, p. 296.

interés público, las opciones del legislador en este campo son amplias, siempre y cuando éste se mueva dentro del marco de la Constitución. En el siglo XX, la función legislativa no se limita a la tarea de hacer las leyes. Su labor también consiste en el examen y la formulación de los principios rectores de la política pública para que la Rama Ejecutiva precise sus detalles.

En Puerto Rico, el desarrollo de la gestión legislativa en este siglo estuvo primeramente matizado por conflictos entre los gobernadores designados por el Presidente y los dirigentes locales. Luego se redujo la brecha durante el dominio absoluto del Poder Ejecutivo y Legislativo por el Partido Popular Democrático. En las últimas décadas la Rama Legislativa ha dejado de ser un cuerpo pasivo. Su reclamo de una distribución real de poder frente al Ejecutivo ha sido objeto de interpretación constitucional por parte de este Tribunal. Hemos reconocido igualmente que la doctrina de separación de poderes requiere que los tribunales seamos, si bien vigilantes del cumplimiento con las normas constitucionales, cautelosos cuando se trata de definir el ámbito de un poder frente a otro. Véanse: R. Serrano Geyls, *Executive-Legislative Relationships in the Government of Puerto Rico, 1900–1954*, XIV Rev. Jur. U.I.A. 11 (1979); R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ramallo Bros., 1986, Vol. I, págs. 571–707.

En *McCormick* v. *Marrero, Juez*, 64 D.P.R. 260, 267 (1944), reconocimos el criterio dominante de la función legislativa en el estado moderno:

La Legislatura tiene amplia discreción para determinar qué es lo que constituye un *fin público* y para tomar aquellas medidas que a su juicio promuevan el bienestar de la comunidad. No es función de los tribunales la de expresar opinión sobre la

sabiduría o conveniencia de una medida legislativa. Si ésta contiene elementos de beneficio público y el propósito que se trata de realizar es de carácter público, la cuestión en cuanto al beneficio que haya de recibir el público debe ser resuelta por la Legislatura y no por los tribunales. . . .

Es deber de todo gobierno, adoptar aquellas medidas que fueren necesarias para promover el bienestar y defender la salud de todos los ciudadanos, especialmente de aquellos a quienes sus escasos medios de fortuna no les permiten adquirir un pedazo de tierra para edificar en ella sus hogares. Basta leer las disposiciones pertinentes de nuestra Ley de Tierras, de acuerdo con las cuales se trata de expropiar la finca de los peticionarios, para convencernos de que el fin a que habrá de dedicarse la finca objeto de la expropiación es uno de carácter público y que a nuestro juicio habrá de contribuir grandemente a levantar el standard de vida de nuestras clases trabajadoras. (Énfasis suplido.)

Dieciséis (16) años más tarde, y ocho (8) después de aprobada la Constitución del Estado Libre Asociado, nos expresamos nuevamente sobre el concepto de *fin público*. Dijimos en aquella ocasión, mediante opinión bien fundamentada del Juez Asociado Señor Serrano Geyls:

. . . Es extremadamente reducida la función judicial de revisar las determinaciones legislativas sobre lo que constituye un "fin público" en la imposición de tributos. A los criterios usuales de autolimitación que guían la "grave y delicada función" judicial de juzgar la validez constitucional de las medidas legislativas —*E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 595–597 (1958)— se une en este caso la especial circunstancia de que la determinación del legislador tiene por base variados elementos de la política pública cuyo escrutinio está fuera de la competencia de los jueces. La aprobación de una medida contributiva requiere el estudio detenido de difíciles problemas políticos, sociales y administrativos, y, sobre todo, pesar el efecto económico de la nueva imposición sobre el consumo, las inversiones, la producción, el empleo, el ingreso y el ahorro. Se explica así la reiterada renuencia de los tribunales a inter-

venir activamente en este asunto. (Escolio omitido.) *P.R. Telephone Co.* v. *Tribl. Contribuciones*, 81 D.P.R. 982, 996 (1960).

En dicho caso se comenta igualmente la posición de la jurisprudencia federal sobre el mismo asunto:

En repetidas ocasiones el Tribunal Supremo federal ha fijado la profundidad de las incursiones judiciales en esta área. En *Carmichael* v. *Southern Coal Co.*, 301 U.S. 495, 514–515 (1937) el Tribunal explicó que desde la adopción de la Enmienda XIV los estados sólo pueden imponer contribuciones para un fin público y no para propósitos privados, pero que los requisitos del debido procedimiento dejan *"campo libre para el ejercicio de una amplia discreción legislativa al determinar qué erogaciones servirán el interés público."* Esa discreción incluye, desde luego, la asignación de fondos para el "bienestar general". *"Las maneras de beneficiar el interés público están peculiarmente dentro del conocimiento de la Legislatura"* y "es a ésta y no a los tribunales a la que corresponde el deber y la responsabilidad de escoger entre los posibles métodos". *Por consiguiente para justificar la intervención de un tribunal se requiere "un caso claro de desviación de cualquier propósito público que razonablemente pudiera concebirse", o como se dijo en Helvering v. Davis, 301 U.S. 619, 640 (1937) "un despliegue de poder arbitrario, no una demostración de juicio". Y esa autoridad judicial, se añadió en Everson v. Board of Education, 330 U.S. 1, 6 (1947) debe ejercitarse con la "más extrema cautela".* (Énfasis suplido.) *P.R. Telephone Co.* v. *Tribl. Contribuciones*, supra, págs. 996–997.[6]

■ Por último, en *P.S.P.* v. *E.L.A.*, supra, por primera vez reclamamos para la Rama Judicial facultades de interpretación en esta área, "aún más amplias que las simplemente derivables de nuestro sistema de separación de poderes". *P.S.P.* v. *E.L.A.*, supra, pág. 598. Hemos exami-

---

[6] Para casos recientes que ilustran este enfoque, véanse: *South Dakota* v. *Dole*, 483 U.S. 203 (1987); *Bowen* v. *Owens*, 476 U.S. 340 (1986); *Hawaii Housing Authority* v. *Midkiff*, 467 U.S. 229 (1984).

nado detenidamente el legajo de la Constituyente y concluimos que el intercambio habido entre sus miembros no tiene el alcance que le dimos en *P.S.P.* v. *E.L.A.*, supra.

La moderna teoría de la separación de poderes adoptada en nuestra Constitución tiene su origen histórico en la teoría política liberal, según expuesta por Locke, y surgió durante los conflictos sociales de Europa de los siglos XVII y XVIII, particularmente en Inglaterra. Originalmente concebido como un instrumento para limitar el poder político, se incorporó a la Constitución de Estados Unidos para evitar una indebida concentración de poderes en unas mismas manos. Aunque la historia ha demostrado que el concepto no implica un grado de separación absoluta ni que cada Rama de Gobierno deba funcionar en el vacío independientemente de las otras, el ejercicio de estos poderes por cada una de ellas exige prudencia, respeto y deferencia a las demás. Véase Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, *op. cit.*, págs. 577–579.

█ La determinación inicial que tomen los poderes públicos —Legislativo y Ejecutivo— sobre lo que es fin público es revisable por el Poder Judicial. Sin embargo, en el desempeño normal de nuestras funciones revisoras bajo el sistema de separación de poderes, los tribunales debemos actuar con prudencia y deferencia a la voluntad legislativa, siempre que la misma esté enmarcada dentro del esquema constitucional y aunque como magistrados discrepemos personalmente de la bondad de los actos legislativos. *Caguas Bus Line* v. *Sierra, Comisionado*, 73 D.P.R. 743, 750 (1952); *Irizarry* v. *Pueblo*, 75 D.P.R. 786, 793–794 (1954); *Berrocal* v. *Tribl. de Distrito*, 76 D.P.R. 38, 65, 92–93 (1954); *Passalacqua* v. *Mun. de San Juan*, 116 D.P.R. 618, 623 (1985).

Dependiendo de la materia presente en la determinación de fin público, el Poder Judicial debe considerar el grado de competencia que tienen las otras Ramas de Gobierno para

establecer la política pública del Estado. Como expresara el ex Juez Presidente, José Trías Monge, citando directamente de Laski, "'[e]stamos comenzando a entender que la autoridad debe posarse allí donde puede ser más sabiamente ejercitada para el bien común'". *In re Rodríguez Torres*, 106 D.P.R. 698, 710 (1978).

Cuando los tribunales determinen entrar a fondo en la consideración de un fin público ya estimado por los otros poderes, deben reconocer que dicho concepto tiene que "ceñirse a las cambiantes condiciones sociales de una comunidad específica y los problemas peculiares que éstas crean y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad democrática altamente compleja". *P.R. Telephone Co.* v. *Tribl. Contribuciones*, supra, pág. 997.

Ahora bien, la Constitución, cuerpo de normas supremas, se impone a la legislación ordinaria. Dicho documento, que constituye nuestro proyecto de vida en comunidad, otorga a la Rama Judicial amplios poderes para examinar actuaciones alegadamente inconstitucionales del Poder Legislativo o Ejecutivo al amparo de la relación dinámica de la separación de poderes. *Silva* v. *Hernández Agosto*, 118 D.P.R. 45 (1986); *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977).

Aclarado el ámbito de la intervención judicial, cuyo contenido no es otro que el acostumbrado bajo un sistema de separación de poderes, examinemos a fondo los reclamos de las partes.

## V

El P.I.P. plantea que en nuestro ordenamiento constitucional la Asamblea Legislativa no tiene poder expreso para legislar sobre el asunto bajo consideración. El E.L.A., por su

parte, afirma que la Legislatura tiene amplios poderes para proteger y garantizar el bienestar y la seguridad del Pueblo de Puerto Rico, y que constituye un fin público para el Estado proveer un sistema de votación en las primarias presidenciales que sea racional, seguro y confiable.

Al examinar este asunto, conviene recordar que "[u]na constitución es un conjunto de normas fundamentales que establece las bases jurídicas de la ordenación político-social de un pueblo protegiendo los derechos y la dignidad esencial de la posición de los ciudadanos, estableciendo las instituciones de gobierno y encauzando los procesos políticos". *La Nueva Constitución de Puerto Rico*, Escuela de Administración Pública, Río Piedras, Eds. U.P.R., 1954, pág. 122. La permanencia y estabilidad de nuestra Constitución depende, en última instancia, de su capacidad para responder a los distintos problemas sociales, económicos y políticos a que se enfrenta el país. Como intérpretes máximos de este documento no podemos limitar su alcance ni congelar sus principios a la época en que se promulgaron. Al interpretar sus postulados básicos nunca debemos olvidar que "[u]na *Constitución* no establece, ni debe establecer, normas para la hora que pasa, sino principios para un futuro que se expande". (Énfasis en el original.) B.M. Cardozo, *La naturaleza de la función judicial*, Buenos Aires, Eds. Arayú, 1955, pág. 64.

Hay que evitar pronunciamientos que la fosilicen y la conviertan en una pieza de museo de historia. "Su vitalidad descansa en su dinamismo. Es un documento que rebasa las preferencias personales de sus autores y plasma la esperanzas de ulteriores generaciones. . . . Interpretamos una Constitución, no los Rollos del Mar Muerto." *P.R. Tel. Co.* v. *Martínez*, 114 D.P.R. 328, 350 (1983). Si limitamos su alcance con normas y pronunciamientos taxativos, conver-

timos su texto en dogmas absolutos e inaplicables a las eventualidades del futuro. "Lo que hay que evitar es el extremismo tanto de las declaraciones utópicas como de las prescripciones ultra-conservadoras." (Énfasis suprimido.) *La Nueva Constitución de Puerto Rico, op. cit.*, pág. 124. Como expresara el Juez Asociado Señor Díaz Cruz en *P.I.P.* v. *E.L.A.*, supra, pág. 414, "[l]a Constitución nunca es barrera para contener la expresión del pueblo sino instrumento de su realización".

Salvo las Secs. 1, 7 y 19 de nuestra Carta de Derechos, *supra*, disposiciones que luego serán objeto de nuestra atención, el P.I.P. no cita principio constitucional adicional que impida que la Legislatura reglamente las primarias al amparo del Art. III, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1.[7] El Estado en modo alguno argumenta que la Ley Núm. 6, *supra*, fuera aprobada bajo el Art. VI, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, relativo a la legislación sobre las elecciones generales. El concepto de sufragio insular restringido no tiene apoyo visible en la Constitución; tampoco en la realidad tal y como acontece ante nuestros ojos.

Como ya expresamos, la Ley de Primarias Presidenciales Compulsorias, en su forma actual, representa el producto de más de una década de labor legislativa. Al amparo del Art. III, Sec. 1 de la Constitución, *supra*, la Asamblea Legislativa ha recogido, dentro de una ley de carácter electoral, el fenómeno de la participación de los puertorriqueños en los procesos que culminan en la selección de los candidatos a la presidencia y vicepresidencia de Estados Unidos.

---

[7] "El Poder Legislativo se ejercerá por una Asamblea Legislativa, que se compondrá de dos Cámaras —el Senado y la Cámara de Representantes— cuyos miembros serán elegidos por votación directa en cada elección general." Art. III, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 334.

█ El Art. III de la Constitución, *supra*, así como el Art. II, Sec. 2 de la misma, L.P.R.A., Tomo 1, están predicados en la existencia de un gobierno democrático representivo. Los partidos políticos locales concurren a las elecciones bajo muy precisas orientaciones políticas. Estos reflejos electorales cristalizan en legislación. Pretender que estas orientaciones no respondan al sentir del sector mayoritario del electorado puertorriqueño se opone a todos los esquemas teóricos y constitucionales esbozados.

█ El derecho electoral figura modernamente entre los derechos eminentemente públicos, aunque no puede considerarse exclusivamente estatal, ya que los ciudadanos lo efectúan no en nombre del Estado, sino más bien en nombre propio. Véase *La Nueva Constitución de Puerto Rico, op. cit.*, pág. 300 *et seq.* Pocos principios de técnica constitucional han conseguido en Puerto Rico y en Estados Unidos afirmación tan plena. "[L]a condición fundamental y preeminente [del derecho de sufragio] se ha reconocido a cabalidad." *Ortiz Angleró* v. *Barreto Pérez*, 110 D.P.R. 84, 88 (1980). Véanse, a modo de ilustración: *Yick Wo* v. *Hopkins*, 118 U.S. 356, 370 (1886); *Reynolds* v. *Sims*, 377 U.S. 533 (1964). La obligación del Estado de proteger ese derecho ha sido igualmente reconocida. Son "objetivos lícitos y apremiantes toda reglamentación que, sin obstaculizar innecesariamente el voto, propenda a la realización de un proceso electoral justo, ordenado, libre de fraude, honesto e íntegro. *P.S.P., P.P.D., P.I.P.* v. *Romero Barceló*, 110 D.P.R. 248 (1980); *P.N.P.* v. *Tribunal Electoral*, 104 D.P.R. 741 (1976)". *P.S.P.* v. *Com. Estatal de Elecciones*, 110 D.P.R. 400, 405–406 (1980).

El elector es acreedor a que su voto sea protegido por el Estado de distintas formas y con distinto rigor bajo una multiplicidad de situaciones. Amplia jurisprudencia así lo reconoce, tanto en Puerto Rico como en Estados Unidos. Véase

*Ortiz Angleró* v. *Barreto Pérez,* supra (referéndum sobre posibles enmiendas a la Constitución). Véanse, con fines ilustrativos: *Sailors* v. *Board of Education,* 387 U.S. 105 (1967) y *Kramer* v. *Union School District,* 395 U.S. 621 (1969) (selección de miembros de cuerpos directivos de distritos escolares); *Cipriano* v. *City of Houma,* 395 U.S. 701 (1969) y *Phoenix* v. *Kolodziejski,* 399 U.S. 204 (1970) (aprobación de emisiones de bonos); *Salyer Land Co.* v. *Tulare Water District,* 410 U.S. 719 (1973) y *Ball* v. *James,* 451 U.S. 355 (1981) (elección de directores de programas de conservación de agua).

En Estados Unidos las votaciones en primarias también han sido objeto de reglamentación por el Estado. Véanse, por ejemplo: *Ray* v. *Blair,* 343 U.S. 214 (1952) (para la selección de candidatos a electores por partidos que postulan candidatos a la presidencia y vicepresidencia de Estados Unidos de Norteamérica); *United States* v. *Classic,* 313 U.S. 299 (1941); *Smith* v. *Allwright,* 321 U.S. 649 (1944); *Kusper* v. *Pontikas,* 414 U.S. 51 (1973), y *Bullock* v. *Carter,* 405 U.S. 134 (1972) (para la selección de candidatos a cargos estatales o federales); *Democratic Party U.S.* v. *Wisconsin,* 450 U.S. 107 (1981) (para la selección de delegados a las convenciones nominadoras de partidos que postulan candidatos a la presidencia y vicepresidencia de Estados Unidos y la expresión de preferencia presidencial por el electorado participante).

También se considera que los partidos políticos han llegado a asumir un rol cada vez más extenso e importante en el funcionamiento cotidiano de los Estados modernos y que existe una correlación entre el sistema de partidos y el ordenamiento constitucional. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico, op. cit.,* pág. 582. El ciudadano raramente participa como individuo aislado y lo hace en cambio como miembro de complejas formaciones

sociales. Desde el punto de vista sociológico los partidos se presentan como organizaciones espontáneas caracterizadas por una comunidad de concepciones o de intereses políticos. Véanse: C.J. Friedrich, *Constitutional Government and Democracy*, Boston, Ginn Co., 1968, y M. Duverger, *Les Partis Politiques*, París, Armand Colin, 1951; R.W. Anderson, *Gobierno y partidos políticos en Puerto Rico*, Madrid, Ed. Tecnos, 1965; B. Pagán, *Historia de los partidos políticos puertorriqueños*, Barcelona, Ed. M. Pareja-Montaña, 1959.

La Constitución del Estado Libre Asociado reconoce la importancia de los partidos políticos dentro de nuestra organización de gobierno, al establecer la fórmula de garantía de representación minoritaria en la Legislatura. Art. III, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1; *Silva* v. *Hernández Agosto*, supra. Así, en *Fuster* v. *Busó*, 102 D.P.R. 327, 346–347 (1974), dijimos:

> En los estados contemporáneos, debido a su gran extensión física y a su mucha población, se hace inevitable que la democracia se ejerza indirectamente a través de representantes. Ya no es posible gobernar mediante el ágora de la Grecia clásica o el *town meeting* de la Nueva Inglaterra del siglo 17. La democracia moderna funciona mediante los partidos políticos. Estos presentan al electorado una síntesis de ideas y programas de gobierno—lo que se llama la plataforma—y también un grupo de hombres que ofrece gobernar en consonancia con esas ideas y programas. Generalmente el electorado tiene ante sí dos o tres alternativas, y al votar endosa la de su preferencia. Como es imposible que varios programas, contradictorios entre sí, sean realizados a la vez, universalmente se acepta que gobernará la mayoría. La minoría fiscaliza para mantener al gobierno dentro de la moral, la ley y la Constitución y espera su turno o su oportunidad de convertirse en mayoría mediante la persuación del electorado. Ese sistema coloca la responsabilidad política en un partido—el partido del gobierno—y en un grupo de hombres—el que preside el gobierno y sus colaboradores más destacados.

■ Ahora bien, los partidos políticos no son las únicas agrupaciones de ciudadanos capaces de canalizar la participación del pueblo en las funciones públicas del Estado. La importancia reciente del voto del elector no afiliado o independiente, y los cambios en el grado de apoyo tradicional a los partidos políticos como consecuencia del crecimiento de las ciudades y el desarrollo económico, implican una revisión de la concepción tradicional de la función de los partidos. Tampoco podemos ignorar que en la sociedad moderna existen otros tipos de movimientos capaces de reagrupar a los ciudadanos y ejercer una determinada presión en defensa de intereses particulares. V.O. Key, Jr., *Politics, Parties and Pressure Groups*, Nueva York, Thomas Y. Crowell Co., 1958.

■ La participación de las agrupaciones políticas puertorriqueñas en los procesos de los partidos políticos norteamericanos ya ocupa una página en nuestra historia y ha sido motivo de mucha controversia. Por un lado, dicha participación es percibida por importantes sectores del pueblo como una fuente adicional de influencia y acceso a la estructura política norteamericana. Para otros sectores constituye una estrategia electoral de los partidos políticos principales, cuyo propósito es integrar el proceso político de Puerto Rico al de Estados Unidos. También hay quien sostiene que es un instrumento de los partidos mayoritarios para medir sus fuerzas antes de las elecciones de noviembre. En cualquiera de los casos, la experiencia de la pasada década demuestra que esta polémica trata de una materia a ser discutida propiamente dentro del proceso político, en las urnas o en aquellos recintos propios de los organismos representativos del Estado. La prudencia judicial nos aconseja que sea en la arena legislativa y no en el foro judicial donde se ventile inicialmente esta controversia.

En estas circunstancias, la distinción entre lo que es un partido político *bona fide*, con aspiraciones de postular can-

didatos para las elecciones locales, y un partido político afiliado, bajo el esquema primarista, no tiene el alcance que le da el demandante apelante. En nuestra época, estos últimos también cumplen una función legítima y el Estado tiene poder para reglamentarlos.

En este caso la Legislatura determinó que era un fin público reglamentar el proceso de sufragio para las primarias presidenciales, de modo que se asegurara su legitimidad y protegiera a aquellos ciudadanos que libremente optasen por participar en esa actividad. Permitir y hacer viable la colaboración ciudadana en unos procesos que pueden influenciar decisiones que afectan a nuestro pueblo, está claramente previsto dentro de los poderes constitucionales delegados a la Rama Legislativa.

Examinada la Ley de Primarias Presidenciales Compulsorias y su historial legislativo resolvemos que, en la materia que nos ocupa, la Legislatura hizo una determinación válida al amparo de sus poderes constitucionales.

## VI

Consideremos, pues, las alegaciones de que los acontecimientos impugnados en la demanda —la celebración de las primarias con fondos públicos— requieren consagración popular ad hoc, vía plebiscito, como evidente manifestación de la voluntad ciudadana, por constituir una invasión de derechos reservados al pueblo y una violación a la Cláusula de Igual Protección de las Leyes de la Constitución del Estado Libre Asociado.

Damos por sentado que el Preámbulo de la Constitución, más allá de mera proclamación de principios, tiene pleno valor de derecho constitucional positivo que se traduce en la adhesión de los constituyentes a unos principios o compromisos. El apelante acepta, no obstante, que el Preámbulo

es un documento "neutral" en materia de desarrollos sobre el *status*. Fundan su reclamo en el Art. II, Sec. 19 de la Carta de Derechos, *supra*. Alegan en su escrito que la Asamblea Legislativa actuó *ultra vires* al aprobar la Ley Núm. 6, *supra*, porque dicha legislación no nace al amparo de uno de los poderes enumerados que el pueblo le delegó. El P.I.P. funda su alegación en la "patente e incontrovertible . . . analogía conceptual y estructural entre la Constitución de Estados Unidos en lo relativo a la doctrina de poderes enumerados delegados al Congreso de los Estados Unidos avalada por la reserva de poderes y derechos de los Estados y del Pueblo Norteamericano y la Constitución del Estado Libre Asociado . . . ". Apelación, pág. 71.

La afirmación requiere un examen más abarcador. El texto del Art. I, Sec. 1 de la Constitución federal establece que el Poder Legislativo que se concede es limitado: "Todos los poderes legislativos otorgados por esta Constitución residirán en un Congreso de los Estados Unidos . . . ." Const. E.U., L.P.R.A., Tomo 1, ed. 1982, pág. 169. Más adelante en el mismo artículo, Sec. 8, se enumeran los poderes principales conferidos al Congreso.

Este diseño constitucional en Estados Unidos es el resultado de la realidad histórica, que dio base a la creación de una nación donde el poder político se distribuye en forma federada. El pueblo norteamericano le confiere parte de dicho poder al Congreso y a las otras Ramas de Gobierno, y parte a los estados. Esta estructura de poder compartido explica la enumeración de poderes. G. Gunther, *Constitucional Law*, 11ma ed., Mineola, Nueva York, 1985; *The Federalist Nos. 33 & 84* (Cooke ed. 1961) (Hamilton); *The Federalist Nos. 44–46* (Cooke ed. 1961) (Madison); M. Farrand, *The Framing of the Constitution of the United States*, New Haven, Yale University Press, 1976.

En lo referente al Poder Legislativo, el Art. III, Sec. 1 de nuestra Constitución, *supra*, pág. 334, dispone: "El Poder Legislativo se ejercerá por una Asamblea Legislativa. . . ." No se enumera un conjunto limitado de poderes. El pueblo delega *todo* el poder legislativo a una Asamblea Legislativa, sujeto a las limitaciones de la Carta de Derechos y otras disposiciones de la Constitución. Es obvio que en Puerto Rico no existe ni ha existido un diseño federado de gobierno. Se entiende que la Asamblea Legislativa, distinto al Congreso, puede legislar sobre cualquier asunto que afecte el bienestar de los puertorriqueños. Contrario a lo que plantea el P.I.P., el argumento sobre soberanía popular y reserva de poderes no puede esgrimirse para impugnar legislación fruto de la labor legislativa en una democracia representativa. Precisamente, debido a su valía constitucional en *Silva v. Hernández Agosto*, supra, reconocimos la importancia de la participación oportuna y efectiva de la representación minoritaria en el proceso legislativo.

Tampoco coincidimos con la contención de que la Sec. 19 de nuestra Carta de Derechos, *supra*, configura una cláusula de reserva sobre *status* que impide que la Legislatura apruebe la Ley de Primarias Presidenciales Compulsorias. Examinemos su texto:

La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente. Tampoco se entenderá como restrictiva de la facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo. Art. II, Sec. 19 de la Carta de Derechos, *supra*, pág. 332.

Aunque su fuente más remota fue la Enmienda IX de la Constitución de Estados Unidos, L.P.R.A., Tomo 1, y el segundo borrador de la Constitución preparado por el Profesor Carl Friedrich, la Sec. 19 responde a unas reali-

dades particulares de nuestro país. J. Trías Monge, *Historia
Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R.,
1982, Vol. III, págs. 207–209. A diferencia de la Constitución
de Estados Unidos, nuestra Constitución contiene disposi-
ciones que requieren del Estado una función dual: que se
abstenga de infringir directamente los derechos de los ciuda-
danos y que, mediante acción gubernamental específica, se
aseguren estas libertades. En este contexto, la Sec. 19 tiene
el propósito de que no se interprete la Constitución como un
"catálogo exhaustivo de los derechos del hombre en Puerto
Rico". Trías Monge, *op. cit.*, pág. 208. Todo lo contrario, se
pretendió "incorporar a la Constitución una disposición que
reconociese el orden especialmente dinámico del derecho en
este campo y permitiese añadir, tanto derechos derivables,
ya o más tarde, de los expresamente enumerados, como
nuevos derechos que fuesen adquiriendo reconocimiento a
través de los años". Íd., pág. 208. Su objetivo fue formular la
intención de los miembros de la Asamblea Constituyente en
el sentido de que la omisión de un derecho no significaba su
exclusión.

Un examen de su historial demuestra que el Informe de
la Comisión de Carta de Derechos recoge claramente el pro-
pósito de la cláusula:

> Esta sección establece dos reglas paralelas de interpreta-
> ción. La primera va enderezada a proteger los derechos del
> individuo contra una interpretación restrictiva o contra una
> interpretación basada en la conocida norma de *inclusio
> unius, exclusio alterius*. Según este último principio inter-
> pretativo, el acto de enumerar conlleva el acto de excluir, de
> suerte que todo lo que no se menciona queda por ese solo he-
> cho descartado. No creemos que en una constitución deba in-
> corporarse un principio de esta inflexibilidad. Por ejemplo, no
> hemos mencionado específicamente el derecho de establecer
> escuelas privadas pero es claro que existe. No hemos estable-
> cido específicamente el derecho a la inviolabilidad de la co-
> rrespondencia pero es claro que esto surge de los demás

derechos consignados y así sucesivamente. Una interpretación en el sentido de que todo lo que no se desprenda literalmente de cada una de las palabras usadas está por lo tanto excluido de la protección constitucional, sería contraria a la actitud básica que ha regido a la Comisión al preferir el lenguaje breve de los grandes principios en vez de la formulación minuciosa de los detalles inagotables.

La segunda oración presenta el contrapolo equilibrador de la primera. La protección más liberal de los derechos del individuo, que es la establecida en esta carta de derechos, no puede perder de vista el básico principio de que la salud del pueblo es la suprema ley. *Los derechos individuales tienen que entenderse dentro del cuadro general de la sociedad con arreglo a las limitaciones inherentes a la vida en común. Ya hemos indicado en ocasiones anteriores cómo resulta una y otra vez necesario tener la ecuanimidad que permita conjugar los derechos individuales que desmesurados podrían resultar conflictivos entre sí y los derechos de la comunidad en su vida, salud y bienestar, representada esta comunidad por la Asamblea Legislativa.*

*Nadie puede preveer la totalidad de problemas que encierra el futuro ni c[ó]mo han de bregar con ellos los intérpretes de un documento constitucional. A punto de terminar nuestro trabajo hemos querido señalar la necesaria coexistencia de estos dos principios a veces en conflicto, cuya armonización constante constituye el arte supremo del gobierno.* (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2576 (1951).

Precisamente en los momentos en que se promulga nuestra Constitución, Puerto Rico había comenzado un programa gubernamental de desarrollo económico que transformó dramáticamente la economía, la sociedad y creó una nueva administración pública. H. Wells, *The Modernization of Puerto Rico: A Political Study of Changing Values and Institutions*, Cambridge, Massachusetts, Harvard University Press, 1969; R. Carr, *Puerto Rico: A Colonial Experiment*, Nueva York, N.Y. Univ. Press, 1984. Dentro de ese espíritu se promulgó una Constitución que dotó a las ramas

gubernamentales con amplios poderes para introducir los programas innovadores que sacaron al país de la miseria de la década del cuarenta. La Sec. 19 de nuestra Carta de Derechos, *supra*, expresamente proveyó la flexibilidad que el Estado necesitaba para la experimentación de esos años, y así evitó que los derechos civiles sirvieran como barreras contra estas medidas:

> La segunda oración de la sección 19 constituía, en las palabras de la Comisión "el contrapolo equilibrador de la primera". Así como se quería asegurar la interpretación más lata posible de los derechos humanos en Puerto Rico y proveer para su crecimiento sin alteración del texto constitucional, se deseaba a la vez garantizarle al Estado el más amplio margen para la experimentación económica y social. Dos tristes recuerdos impelían la adopción de este segundo principio: los ataques desatados contra los programas iniciales del Partido Popular y la experiencia del uso literal durante las primeras décadas del siglo de los propios derechos civiles como arma contra las medidas de progreso social. Trías Monge, *op. cit.*, pág. 209.

En otras palabras, la Sec. 19 de nuestra Carta de Derechos, *supra*, lejos de ser una fuente limitativa del Poder Legislativo, lo estimula. Para responder a las necesidades de Puerto Rico, la Asamblea Constituyente reconoció amplios poderes a la Rama Legislativa para formular "los detalles inagotables" de la política pública.

## VII

Examinemos el argumento de que el uso de fondos públicos en el suceso primarista —o la Ley Núm. 6, *supra*, en sí— viola la igual protección de las leyes y discrimina por ideas políticas.

Un examen reflexivo del alegato del P.I.P. demuestra que el apelante no indica qué disposiciones de la ley producen tal resultado. Hace caso omiso del primer paso que necesaria-

mente hay que dar en casos como el presente: determinar si la ley en cuestión establece una clasificación como medio de lograr sus propósitos, o si la misma afecta un derecho fundamental. 2 *Rotunda, Nowak y Young, Treatise on Constitutional Law: Substance and Procedure* Sec. 18.1, págs. 315–316 (1986); L.H. Tribe, *American Constitutional Law*, 2da ed., Mineola, Nueva York, Foundation Press, 1988, Sec. 16.1; *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267 (1975); *P.S.P., P.P.D., P.I.P.* v. *Romero Barceló*, 110 D.P.R. 248 (1980).

■ La Ley de Primarias Presidenciales Compulsorias no le concede fondos a ningún partido político. Tampoco lo hace la Resolución Conjunta del Senado Núm. 2287 de 5 de febrero de 1988. Todos los fondos públicos aquí en cuestión se le conceden a la Comisión Estatal para que su presidente los utilice de acuerdo con el esquema legislativo. No se trata, pues, de la concesión de un fondo de campaña para uso particular de unos partidos en sus campañas eleccionarias.

Los casos citados por el apelante —*P.S.P.* v. *Srio. de Hacienda*, 110 D.P.R. 313 (1980); *Marrero* v. *Mun. de Morovis*, 115 D.P.R. 643 (1984), y *P.N.P.* v. *Tribunal Electoral*, 104 D.P.R. 741 (1976)— son inaplicables a la situación de autos. Dicha jurisprudencia se refiere a casos de trato desigual e irrazonable en el contexto de los procesos electorales ordinarios donde, luego de identificarse por este Tribunal un derecho fundamental —el derecho al ejercicio de la franquicia electoral— concluimos que el trato desigual constituía un discrimen prohibido.

■ No existe prueba de que la Asamblea Legislativa al aprobar la ley de marras estuviese motivada por un propósito discriminatorio contra el P.I.P. o aquellas personas que, a pesar de gozar de plena capacidad electoral, decidan no participar en las primarias presidenciales y, por el contrario,

elijan promover una campaña pública de abstención o rechazo a los comicios. El propósito de la ley no es proyectar un endoso oficial a ningún partido local o fórmula de *status*. Tampoco tiene el objetivo de propiciar a los partidos un mecanismo alterno de recaudación de fondos o limitar las potencialidades de financiamiento de campaña de aquellas entidades opuestas a las primarias presidenciales. Véanse, por ejemplo: *Washington* v. *Davis*, 426 U.S. 229 (1976); *Arlington Heights* v. *Metropolitan Housing Corp.*, 429 U.S. 252 (1977); *Mobile* v. *Bolden*, 446 U.S. 55 (1980); *Rogers* v. *Lodge*, 458 U.S. 613 (1982); *Hunter* v. *Underwood*, 471 U.S. 222 (1985).

La mera posibilidad de que la publicidad y celebración de las primarias pueda tener un efecto adverso sobre los intereses ideológicos o políticos del demandante no es suficiente para establecer la inconstitucionalidad de la ley, así como tampoco impide el uso de fondos del Estado en una actividad que la Legislatura determinó que estaba revestida de interés público.

Las disposiciones de la ley impugnada son neutrales, no contienen clasificación alguna ni tampoco inciden de su faz en un derecho fundamental. En ausencia igualmente de un propósito discriminatorio no erró el tribunal a quo al utilizar un análisis tradicional de escrutinio constitucional y concluir que la acción legislativa bajo ataque era válida. Dicha legislación no es arbitraria y se percibe claramente un nexo racional entre la misma y un interés legítimo del Estado: garantizar que aquellos que decidan ejercer el derecho al voto el 20 de marzo de 1988 en las primarias presidenciales concurran con métodos democráticos y en ambiente de paz y seguridad.

## VIII

Atendamos, por último, un reclamo sobre el que rige bastante confusión tanto en el alegato del apelante como en las comparecencias de los codemandados apelados Marlene I. Gillette y Carlos Canals Mora. Nos referimos al alegato "envolvimiento" de la Comisión Estatal en la celebración de la elección interna del Partido Demócrata de Puerto Rico.

▮ Aun cuando tomáramos conocimiento judicial de unos documentos que no fueron objeto de prueba ni estipulación en instancia, de éstos en forma alguna se desprende que la Comisión Estatal o sus funcionarios estén participando en los procesos internos del Partido Demócrata de Puerto Rico.

La información incluida revela que uno de los organismos rectores del *Democratic National Party*, un "partido nacional" a los fines de la Ley de Primarias Presidenciales Compulsorias, 16 L.P.R.A. sec. 1322(m), que no es parte en este pleito, ha aprobado una propuesta del Partido Demócrata de Puerto Rico, un "partido afiliado", 16 L.P.R.A. sec. 1322(n), para la reorganización de las estructuras de mando hasta 1992. El plan dispone que los delegados electos en las primarias presidenciales formarán parte del Comité Ejecutivo del Partido Demócrata en Puerto Rico que elegirá a los oficiales de dicho partido por espacio de cuatro (4) años.

Corresponde al "partido afiliado" y al "partido nacional" determinar y escoger su estructura interna, así como adjudicar el rol que desempeñarán en dicha estructura los delegados electos el próximo 20 de marzo. Declinamos la invitación de los codemandados Gillette y Canals para que intervengamos directa o indirectamente con la libertad de asociación y procesos internos de los partidos afiliados o nacionales. Véanse, por ejemplo: *O'Brien* v. *Brown*, 409 U.S. 1 (1972); *Cousins* v. *Wigoda*, 419 U.S. 477 (1975); *Tashjian* v. *Republican Party of Connecticut*, 93 L. Ed. 2d 514 (1986);

*Democratic Party of U.S.* v. *Wisconsin*, 450 U.S. 107, 124 (1981).

Finalmente, no debe haber duda sobre el ámbito de la primaria presidencial autorizada por la Ley Núm. 6, *supra*. Dicha ley fue enmendada por la Ley Núm. 89 de 2 de julio de 1987, y en el Art. 18 de la misma, renumerado como el Art. 17 se especifica en qué consiste el evento:

*Artículo 17.—Votaciones—*

Las Primarias Presidenciales establecidas en esta ley consistirán de la votación en una papeleta donde los electores expresarán su preferencia por el aspirante a la candidatura presidencial del Partido Nacional del cual son partidarios *bona fide* y en [*sic*] una papeleta para elegir delegados y delegados alternos a la Convención Nominadora Nacional. El resultado de la expresión de preferencia de candidato presidencial no afectará la elección de delegados o delegados alternos. (Escolio omitido.) 1987 Leyes de Puerto Rico 379–380.

Ni en esta disposición ni en ninguna otra de la Ley Núm. 6, *supra*, se habla de elegir otros funcionarios diferentes a los delegados ni se menciona el término "elección interna". Distinto a la Ley Núm. 102 de 24 de junio de 1977 (16 L.P.R.A. ant. secs. 1301–1309), la Ley Núm. 6, *supra*, sólo autoriza en el proceso fijado para marzo dos votaciones: una votación de preferencia por candidatos presidenciales y una elección de delegados. En estas circunstancias, no hay duda de que la controversia en este caso se reduce a si la asignación de fondos públicos a la Comisión Estatal para la celebración y supervisión de esos comicios es constitucional.

Por las consideraciones expuestas anteriormente, *se confirmará la sentencia del Tribunal Superior que declaró constitucional la Ley de Primarias Presidenciales Compulsorias de 1979, y la asignación de fondos públicos a la Comisión Estatal para celebrar y supervisar un sistema de votación racional y seguro en estos comicios.*

La Ley Núm. 6, *supra*, constituye una extensa reglamentación de las primarias presidenciales válidamente promulgada por la Asamblea Legislativa al amparo de sus poderes constitucionales. En vista de que su propio texto prohíbe una vinculación oficial entre los resultados de las primarias y la relación jurídica entre Puerto Rico y Estados Unidos, y considerando que la ley no viola la Cláusula de Igual Protección de las Leyes de la Constitución del Estado Libre Asociado, *resolvemos que dicho estatuto no adolece de defecto constitucional.*

El Juez Presidente Señor Pons Núñez emitió voto particular de conformidad con la opinión del Tribunal. El Juez Asociado Señor Ortiz emitió voto particular de conformidad con la opinión del Tribunal, al cual se une el Juez Presidente Señor Pons Núñez. El Juez Asociado Señor Alonso Alonso emitió voto particular de conformidad con la opinión del Tribunal. Los Jueces Asociados Señores Negrón García y Rebollo López emitieron opiniones disidentes.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

¿DEMOCRACIA o PARTIDOCRACIA? Esta interrogante compendia el sustrato de la verdadera disyuntiva adjudicativa que implica para este Foro convalidar y legalizar el uso de fondos públicos bajo la Ley de Primarias Presidenciales Compulsorias.[1]

---

[1] La historia legislativa del sistema de primarias presidenciales compulsorias —conforme la cronología estatutaria— comienza con la Ley Núm. 102 de 24 de junio de 1977 (16 L.P.R.A. ant. secs. 1301–1319) y la Resolución Conjunta Núm. 17 de 30 de junio de 1978. Aquélla fue derogada por la Ley Núm. 6 de 24 de septiembre de 1979 (16 L.P.R.A. secs. 1321–1353), posteriormente enmendada por la Ley Núm. 34 de 3 de octubre de 1983, la Ley Núm. 2 de 15 de marzo de 1984 y la Ley Núm. 89 de 2 de julio de 1987 (16 L.P.R.A. secs. 1322–1353).

En la óptica "daltoniana" del jurisprudente, la trascendencia del meritorio reclamo del Partido Independentista Puertorriqueño (P.I.P.) es evidente. Toma cuerpo en sólidos principios de igualdad electoral reconocidos sensiblemente a las minorías en nuestra Constitución y elenco doctrinario jurisprudencial. "Claro está que, en materia de óptica, todo lo hace el ojo humano. Cada ojo tiene su cristalino, pero no todos los cristalinos son iguales. Por eso France decía: 'Cuán distinto se ofrecería el mundo al hombre visto a través del cristalino de un mosquito.'" J.C. Luqui, *El orden jurídico-político y los abogados*, 1985-E Rev. Jur. Arg. La Ley 751, 754 (1985).

El P.I.P. invoca unos postulados cardinales que existen, impositivos de unos límites a los excesos avasalladores y desvíos de las vías y mecanismos legales de acceso que las mayorías legislativas tienen como representantes legítimos de los partidos políticos y sus miembros, y que ideológicamente propulsan afianzar el vínculo *permanente* con Estados Unidos, según previstos en la fórmula conciliatoria política acuñada oficialmente en la frase *Estado Libre Asociado*.

Más allá de sus voces gramaticales, esta frase es la combinación histórica de los sentimientos vivos tripartitas ideológicos que se respetaron y quedaron incrustados en la Constitución. Debe recordarse —y merece repetirse— que, en palabras de Luis Muñoz Marín, Presidente de la Comisión de Preámbulo, Ordenanzas y Procedimientos de Enmiendas a la Constitución, "no significa república, ni estado independiente y separado; tampoco estado de la Unión". En materia de *status*, su naturaleza es neutral, esto es, "ni *excluye* ni *implica* la estadidad federada, la independencia separada u otra forma de organización política a que nos pueda conducir nuestra voluntad y destino". (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2555 y 2557 (1951).

Como resolvimos en *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590, 606 (1978), la "Constitución del Estado Libre Asociado quiso diseñar un esquema que dejase libre a todo ciudadano para propulsar y defender sus propias ideas sobre el destino final de nuestro pueblo. *No puede invocarse la Constitución de Puerto Rico como apoyo para paso alguno que incline o aparente inclinar la balanza, a juicio de otros sectores de opinión, hacia determinado tipo de status*". (Énfasis suplido.)

Nuestra misión no es juzgar la sabiduría, conveniencia, oportunidad o acierto de esta ley. Sólo examinamos si los medios elegidos por la Asamblea Legislativa son compatibles con nuestra Constitución en su proyección multidimensional. Lo contrario es claudicar la función judicial.

Si la Asamblea Legislativa y el Ejecutivo desean legítimamente dar cabida válida a las primarias presidenciales — por su nexo racional y en respuesta al deseo mayoritario ciudadano de intervenir en la selección del presidente de Estados Unidos— pueden hacerlo de frente y no de espaldas a la Constitución. No deben debilitar las tres bases en que se apuntala: histórica, sociológica y política. "Una Constitución no es sólo un conjunto de normas, sino un sistema de valores plenos de contenido histórico y político. Cuando no se entiende así, sirviendo a esos valores, sino haciendo de cada norma un sofisma para falsificar la realidad política, estamos haciendo en la semántica constitucional un fin en sí mismo . . . ." A.E. Mooney, *La elección del Poder Ejecutivo nacional (legalidad versus legitimidad)*, 1985-E Rev. Jur. Arg. La Ley 545, 548 (1985). Como ley fundamental, se "encuentra localizada en la cúspide de la pirámide estructural de orden jurídico. La constitución, aunque aspira a lograr una mayor estabilidad, como documento producto de la mente humana, no es permanente, sino flexible y dinámica. No cierra las puertas a las transformaciones culturales, sociales, políticas,

económicas y geopolíticas que conllevan las sustituciones generacionales. Es más bien una declaración de principios contentivos de lineamientos fundamentales. Rechaza todo inmovilismo doctrinal y opera a base de las circunstancias históricas cambiantes. El genio creador y la fecundidad jurídica de la humanidad en la búsqueda de fórmulas justicieras de convivencia social, se nutren de formas abiertas, no enquistadas. Lo contrario expone a la carta constitucional al desuso, pérdida de respeto, reforma abrupta radical o que sea barrida fulminantemente por la violencia de las revoluciones. En evitación de estos cambios traumáticos, toda Ley Fundamental científicamente redactada e inteligentemente interpretada contiene su propia mecánica para fecundar y viabilizar el cambio: la cláusula de enmienda constitucional". (Escolio omitido.) *Ortiz Angleró* v. *Barreto Pérez*, 110 D.P.R. 84, 107–108 (1980), opinión concurrente del Juez Asociado Señor Negrón García.

## I

El P.I.P., como partido *bona fide* puertorriqueño, solicitó del Tribunal Superior, Sala de San Juan, un decreto de inconstitucionalidad de la aludida Ley de Primarias Presidenciales Compulsorias y un interdicto dirigido a la Comisión Estatal de Elecciones prohibiéndole el uso de fondos, recursos y propiedades públicas en la planificación, organización y estructuración de las primarias presidenciales pautadas para el próximo 20 de marzo de 1988. El Estado compareció a sostener su validez.(2)

---

(2) Por su parte, los demandados Marlene I. Gillette y Carlos Canals Mora asumieron la posición de que la elección en las primarias de 20 de marzo *simultánea*, no sólo a los delegados a la Convención Demócrata Nacional, *sino a los miembros directos del Comité Ejecutivo del Partido Demócrata local,* viciaba las mismas de inconstitucionalidad. A tales efectos sostuvieron que dicho partido no era *local bona fide,* no existía con fines públicos justificativos de esas elecciones

Luego de varios incidentes, dicho foro concluyó que la controversia no constituía cosa juzgada, que no existía precedente judicial atinante y que la ley era válida. Razonó que el propósito legislativo de "asegurar la paz y tranquilidad" en el proceso primarista superaba cualquier beneficio económico que la ley pudiera tener en los partidos nacionales, Demócrata y Republicano, en Estados Unidos. A su juicio, la reglamentación y participación del Estado no constituía un cambio en las relaciones políticas con Estados Unidos ni en el presente *status*. Finalmente, rechazó el planteamiento sobre violación a la igual protección de las leyes. Al hacerlo descartó expresamente el análisis de estricto escrutinio judicial a base de que la ley impugnada: (1) no establece clasificaciones; (2) su propósito es garantizar la paz pública; (3) el que afecte adversamente al P.I.P. no significa trato desigual; (4) no infringe derecho fundamental alguno, y (5) la normativa jurisprudencial relativa a la igualdad en el proceso electoral no es aplicable.

II

Ante nos, el P.I.P. señala que el "juzgador de instancia, inexplicablemente, analizó los propósitos procesales de la Ley de Primarias Presidenciales obviando los sustantivos. Ofuscado en un supuesto propósito legislativo 'legítimo' de promover un 'sistema de votación racional, seguro y confiable que permite que dichos procesos se lleven a cabo con seguridad y en un ambiente de paz social', que le 'vendió' el legislador, pasó por alto el contenido real y propósito fundamental de esa actividad, lo cual es de conocimiento popular absoluto en Puerto Rico: *las primarias presidenciales son una actividad política descarnada de facciones e institu-*

---

internas, y el orden y seguridad no era suficiente interés legislativo, pues ello podía lograrse por otros medios. Invocaron como precedente a *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1978). En apelación reiteran esos argumentos.

*ciones sectarias que promueven fines políticos tales como la Estadidad y desarrollos políticos del Estado Libre Asociado, el patronazgo, favores y nombramientos desde las más altas esferas del Gobierno de Estados Unidos*". (Énfasis del original.) Apelación, pág. 4. A tal efecto reproduce el mensaje del Presidente del Senado, Hon. Miguel A. Hernández Agosto, en el que anunciaba el 25 de enero de 1988 su candidatura a la presidencia del Partido Demócrata, y un comunicado de prensa de la Copresidenta, Sra. Marlene I. Gillette, los cuales transcribimos al calce.[3]

---

(3) El primero afirmó:

"Como consecuencia de *nuestra relación permanente* con los Estados Unidos, funcionan en Puerto Rico una diversidad de programas federales; se designan funcionarios cuyas decisiones nos afectan, se nombran jueces a la corte federal de Puerto Rico. *Todo esto ocurre como función propia del sistema político norteamericano regido por dos partidos políticos nacionales: el Demócrata y el Republicano. Es importante, por lo tanto, tener acceso a uno de esos dos partidos políticos.*

"*La relación tradicional de los republicanos de Puerto Rico —bajo los distintos nombres que ellos se han dado de tiempo en tiempo— ha sido con el Partido Republicano. La de los populares ha sido con el Partido Demócrata.*

"*El Partido Demócrata de los Estados Unidos y el Popular tienen historias paralelas.* Los Demócratas y los Populares tenemos una visión común de lo que el gobierno debe hacer para mejorar las condiciones de vida del ciudadano. Los Demócratas han respetado siempre nuestra conducta de pueblo y nos han ayudado a alcanzar mayores niveles de gobierno propio. Los republicanos están comprometidos con la estadidad, los demócratas con la libre determinación.

"Bajo una administración demócrata, la [del] Presidente Woodr[o]w Wilson, se aprobó la Ley Jones, que entre otras cosas creó un Senado electivo por primera vez.

"Bajo la administración del Presidente Roosevelt, demócrata, se extendieron a Puerto Rico en la década de 1930–40 importantes programas para crear empleos y para distribuir alimentos entre los puertorriqueños, en momentos en que Puerto Rico confrontaba dolorosas condiciones de miseria y de hambre.

"El Presidente Truman, demócrata, designa en el 1946 a Don Jesús T. Piñero, primer puertorriqueño Gobernador de Puerto Rico. Bajo su administración también se aprobó la Ley del Gobernador Electivo que nos permitió llevar a Don Luis Muñoz Marín a la gobernación de Puerto Rico.

"Fue el Presidente Demócrata Harry S. Truman quien propició todo el proceso que entre 1950 a 1952 culminó en la creación del Estado Libre Asociado de Puerto Rico el 25 de julio de 1952.

"Fue bajo un Presidente Demócrata que se utilizó el talento puertorriqueño para poner en vigor una nueva política de relaciones con Latinoamérica, cuando el Presidente Kennedy reclutó a los puertorriqueños Teodoro Moscoso y Arturo Morales Carrión para dirigir importantes programas de su administración.

Como errores, discute que el foro de instancia no siguió como precedente nuestra decisión en *P.S.P.* v. *E.L.A.*, supra;

"*Es clara nuestra relación histórica con el Partido Demócrata de los Estados Unidos. Repito, nos unen propósitos comunes, ideales comunes, una visión común de la función de los partidos y del gobierno en el afán de mejorar la calidad de vida de nuestra gente.*

"Cuando esa relación se ha interrumpido, nuestro progreso se ha interrumpido. El ejemplo lo tenemos cuando el Presidente Carter, respondiendo a los republicanos que invadieron el Partido Demócrata de Puerto Rico, designó republicanos a importantes cargos federales en Puerto Rico. Incluso, su administración contribuyó al encubrimiento de los sucesos del Cerro Maravilla. Le tomó a Carter ocho años y un viaje en el Crucero 'Sovereign of the Seas' para darse cuenta que había estado bregando con republicanos disfrazados de demócratas.

"*El acceso a los partidos nacionales se puede usar tanto para afirmar como para revocar la voluntad del pueblo de Puerto Rico. Los estadistas se han valido del Partido Republicano para detener el desarrollo del ELA; lograron que el Presidente Ford descartase el Nuevo Pacto de Unión Permanente, que respondía a la voluntad de nuestro pueblo, y apoyar a la estadidad. Los candidatos republicanos principales a la nominación presidencial [—]Bush y Dole — apoyan la estadidad. Si les permitimos controlar el Partido Demócrata, lo utilizarían con igual fin. Y eso no lo podemos permitir. No podemos permitir el asalto a la voluntad de nuestro pueblo.*

"*Hay una agenda de bien para Puerto Rico y para los Estados Unidos que se puede cumplir si los populares controlamos el Partido Demócrata en Puerto Rico.*

"1. Fortalecer el Estado Libre Asociado, especialmente en lo que respecta a su autonomía fiscal; (936).

"2. Ampliar las ayudas a las familias pobres — AFDC, Medicaid, SSI, cupones de alimentos.

"3. Ayudar a nuestros compatriotas en los Estados Unidos.

"4. Servir de puente de entendimiento entre Estados Unidos y Latinoamérica.

"5. Lograr nombramientos a puestos federales de personas que respeten y apoyen la voluntad mayoritaria del pueblo puertorriqueño.

"*Si nosotros los populares no nos movemos en esa dirección, nuestros adversarios ocuparán el campo y utilizarán el acceso al Partido Demócrata para promover todo lo contrario.*

"*Después de un amplio proceso de consulta con el liderato de base y con los organismos directivos del Partido, anuncio hoy públicamente lo que ya informé el pasado 16 de enero al Consejo General: asumo, por los populares la responsabilidad de la candidatura a la Presidencia del Partido Demócrata de Puerto Rico. Lo hago convencido de que es éste un buen servicio a nuestro pueblo.*

"No se trata de una candidatura de trampolín político para otros cargos. Se trata de un servicio al país.

"*En el PNP, más que una primaria por el control del Partido Demócrata, hay una lucha interna de poder. . . . Allí se juega la candidatura a la gobernación por el PNP. En el PPD está en juego el mejor servicio a Puerto Rico.*

"Exhorto a todos los populares a participar activamente en este proceso. Debemos devolver el control del Partido Demócrata al Partido Popular Democrático. Tenemos que consolidar nuestras fuerzas para impedir que el país retorne al

circunscribió su análisis al simple escrutinio de mera razona-
bilidad, y no aplicó las normas vigentes sobre interpretación
de erogación de fondos públicos.

---

período de confrontaciones que vivió bajo la Administración de Romero. Puerto
Rico necesita dedicar todas sus energías para combatir el desempleo, la drogadic-
ción; mejorar la educación, construir viviendas, ampliar los servicios de salud,
desarrollar la economía. No puede volver a desperdiciar esas energías en luchas
entre puertorriqueños. Necesitamos un pueblo unido en su voluntad de progreso
y bienestar. *La primera prueba es el 20 de marzo.*

"Yo invito a los Populares y a todos los puertorriqueños a que vayamos
juntos el 20 de marzo. Es momento de unidad por encima de cualquier otra consi-
deración.

"*Juntos*, para defender nuestra democracia de la práctica inmoral de doble
voto.

"*Juntos*, para defender nuestra personalidad de pueblo.

"*Juntos, para que se respete la voluntad del pueblo de Puerto Rico en cuan-
to a su relación con Estados Unidos.*

"No tengo duda de que nuestro pueblo responderá presente y se dará a sí
mismo una gran victoria el próximo 20 de marzo." (Énfasis suplido.) Apéndice,
págs. 298–304.

El comunicado de prensa de Marlene I. Gillette expresaba:

"PARTIDO DEMÓCRATA DE PUERTO RICO
"MARLENE I. GILLETTE
"COMUNICADO DE PRENSA
"29 DE ENERO DE 1988

"La co-presidenta del Partido Demócrata de Puerto Rico, Marlene Gillette,
recordó a 'todos aquellos electores que deseen votar en las primarias presiden-
ciales del próximo 20 de marzo que no se hayan inscrito o que tengan que transfe-
rirse o reubicarse a realizar esas transacciones mañana sábado en las diversas
[J]untas de [I]nscripción Permanentes [*sic*] en todos los precintos electorales de
Puerto Rico'.

"La dirigente de la facción estadista de dicho partido nacional enfatizó la
importancia de participar en la primaria demócrata. *Cada voto que se emita en
las primarias del 20 de marzo nos acercan más a la Estadidad. Al votar por un
candidato presidencial estadista se estará contribuyendo con la causa estadista.
Al votar por unos delegados que elegirán a estadistas a las principales posi-
ciones directas dentro del Partido Demócrata local se estará adelantando la
Estadidad.*

"*Gillette señaló que 'aún los que voten por los delegados populares estarán
contribuyendo con la causa estadista ya que, mientras más ciudadanos puerto-
rriqueños participen en este proceso de selección del Presidente de los Estados
Unidos, más nos acercamos al voto presidencial y la Estadidad'.*

"Recordó, sin embargo, que 'para votar, hay que estar debidamente inscrito,
transferido o reubicado por lo que exhortamos a quienes necesiten hacer una
transacción electoral a que la hagan mañana sábado entre 8 de la mañana y las 4
de la tarde en la Junta de Inscripción Permanente del precinto correspondiente'."
(Énfasis suplido.) Apéndice, pág. 304A.

## III

La Ley de Primarias Presidenciales Compulsorias, según enmendada,[4] es inconstitucional. Nada sustancial ha variado desde que así nos pronunciamos en *P.S.P.* v. *E.L.A.*, su-

---

[4] En la Exposición de Motivos de la Ley Núm. 102 de 24 de junio de 1977 se consignó su propósito:

*"El Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico establece como factor determinante de nuestra vida 'la ciudadanía de los Estados Unidos y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas'. Uno de esos derechos es el de nominar candidatos a la Presidencia y Vicepresidencia de los Estados Unidos.* Los puertorriqueños han estado participando en las Convenciones Nacionales de los Partidos Nacionales por casi medio siglo. Sin embargo, no ha existido hasta este momento una ley que garantice la más amplia participación de los puertorriqueños, como ciudadanos americanos, en la selección de los delegados que nos representan en las convenciones de los Partidos Nacionales para la nominación de candidatos a la Presidencia y Vicepresidencia de los Estados Unidos.

"En el pasado los delegados a dichas Convenciones Nacionales han sido seleccionados mediante el procedimiento conocido como *caucus*, el cual no permite la participación amplia de todos los ciudadanos interesados. Permitir la continuación del sistema de *caucus* para seleccionar los delegados de Puerto Rico a las Convenciones Nacionales, frustraría la política pública vigente que tiende a darle al ciudadano la mayor participación posible en los procesos democráticos.

*"Es, pues, el propósito de esta ley, garantizar al pueblo puertorriqueño la mayor participación en la elección de sus delegados a la convención de los Partidos Nacionales, para nominar los candidatos a Presidente y Vicepresidente de los Estados Unidos por medio del sufragio igual, directo y secreto."* (Énfasis suplido.) 1977 Leyes de Puerto Rico 263–264.

En la Ley Núm. 6 de 24 de septiembre de 1979 se expresa:

"La participación de los puertorriqueños *en los procesos políticos de nuestra Nación* está acorde con lo consignado en el Preámbulo de la Constitución de Puerto Rico.

". . . El propósito principal de la presente ley, al igual que lo fue el de su legislación antecesora, es el de proveer un sistema racional y seguro que viabilice las manifiestas ansias de nuestros ciudadanos de participar activamente en los procesos de selección de los delegados puertorriqueños que participan en las convenciones nominadoras de los partidos nacionales, así como en los procesos internos de dichos partidos, como es el de redactar la plataforma de cada partido nacional que eventualmente pueda constituirse en el programa de gobierno de la nación. Existe en el votante un legítimo interés de seleccionar libremente las personas que habrán de representarle en la confección del programa de gobierno de cada Partido Nacional." (Énfasis suplido.) 1979 Leyes de Puerto Rico 1048–1049.

Esta ley fue enmendada por la Ley Núm. 34 de 3 de octubre de 1983, la Ley Núm. 2 de 15 de marzo de 1984 y la Ley Núm. 89 de 2 de julio de 1987, *supra.* Básicamente sus disposiciones esenciales permanecieron intocadas.

638

pra, y *P.I.P.* v. *E.L.A.*, 109 D.P.R. 403 (1980). Las enmiendas introducidas son cosméticas y subsisten sus propósitos originales. Si algo ha demostrado la historia es su carácter eminentemente sectario y proselitista para adelantar dos causas comunes: *ante diem* de las elecciones generales y *antesala* del voto presidencial. "[E]n un país como el nuestro que padece de racionalismo jurídico donde expresa o implícitamente se termina por creer que legislar es resolver los problemas y que todo lo legal es real y de ahí que muchos gobernantes terminan por creer que gobernar es legislar y que basta decorar una realidad con un pedrerío de normas para que ésta desaparezca en sus zonas de conflicto bajo el mandato legal." A.E. Mooney, *Comentario al "Estatuto de los Partidos Políticos"*, 1983-E Rev. Jur. Arg. La Ley 769, 772 (1983).

Inevitable, pues, que con los reajustes imprescindibles de lenguaje evoquemos los criterios y fundamentos que en *P.S.P.* v. *E.L.A.*, supra, prendieron en nuestra conciencia judicial, permanecieron inalterados frente a criterios fluctuantes en *P.I.P.* v. *E.L.A.*, supra, y aún subsisten al cabo de una década.(5)

Los principios que invoca el P.I.P. en su demanda no han cambiado. Sólo han variado algunos protagonistas del escenario político, la crudeza de las posturas y vaivenes partidistas y, claro está, la integración de este Tribunal.

Ciertamente que *P.S.P.* v. *E.L.A.*, supra —como única opinión suscrita y endosada por una mayoría— es el precedente judicial (*stare decisis*) correcto. Incidió, pues, el ilustrado foro de instancia en la medida en que resolvió lo contrario. Sin embargo, la cuestión no tiene relevancia. Salvo

---

(5) Excepto cuando medie aclaración, los textos reproducidos corresponden a nuestra opinión concurrente en *P.S.P.* v. *E.L.A.*, supra, págs. 612–630, y la opinión disidente —a la cual se unió el Juez Asociado Señor Torres Rigual— emitida en *P.I.P.* v. *E.L.A.*, 109 D.P.R. 403, 414–439 (1980).

uno, no queda ninguno de los miembros integrantes del Tribunal Supremo de aquella época. Sólo el valor intrínseco de los fundamentos de las ponencias mayoritarias, concurrentes y disidentes. La cuestión de precedente es, por lo tanto, inconsecuente.

Lamentablemente nuestra prédica ha sido en el desierto. Con libertad para otro curso decisorio, la mayoría ha optado por sostener la validez de la ley en un análisis genérico sobre el concepto de fin y fondos públicos a base de sus bondades y, sobre todo, que es el reflejo fiel de los criterios prevalecientes en la Asamblea Legislativa. El enfoque es restrictivo e incompleto. Como camino decisorio intelectual, no logra superar el sentido de justicia ni da plena vigencia el *derecho vivo* apuntalado en un verdadero principio de igualdad política. La verdad jurídica nunca puede atentar contra la verdad humana. Después de todo, la verdad es como el agua, o es pura o no lo es.

Como técnica adjudicativa nos preocupa el enfoque. Que la ley tenga una extensa y elaborada exposición de motivos, que reglamente "escrupulosamente unos comicios" (opinión del Tribunal, pág. 601) y que niegue —aun cuando sea innegable— su carácter proselitista, no la hace constitucional. Hemos tenido dificultad en detectar las razones de decidir de la opinión mayoritaria y de las concurrentes. Al integrarlas en una correcta discursiva, afloran múltiples contradicciones. Veamos.

Por un lado se cita de la exposición de motivos de la ley el fundamento de garantizar "'la libertad de conciencia que requiere el proceso del sufragio'" (opinión del Tribunal, pág. 597); se resumen detalladamente sus características electorales (íd., pág. 599);(6) se hace una miniglosa del concepto de

---

(6) A saber, requisitos de inscripción; fecha de celebración; nominación de candidatos; sistema de votación para el "evento electoral"; método de identifica-

fines públicos (íd., págs. 606–612); se habla de la importancia del sufragio, los derechos de los electores y las primarias (íd., págs. 615–616); de la institucionalización de los partidos políticos como vehículos de expresión ciudadana (íd., págs. 616–619); —y por arte de magia, sin ulteriores razonamientos— se llega a las conclusiones siguientes:

La "distinción entre lo que es un partido político *bona fide*, con aspiraciones de postular candidatos para las elecciones locales, y un partido político afiliado, bajo el esquema primarista, no tiene el alcance que le da el [P.I.P.]". Opinión del Tribunal, págs. 618–619. Nos preguntamos, ¿cuál es su alcance? Ciertamente, no es posible establecer una dicotomía válida entre el código electoral —como regente único de la planificación y resultados de los comicios electorales locales— y las primarias presidenciales como esquema separado. Precisamente, esa es la controversia a adjudicarse en este pleito. No podemos lógicamente diferenciar, a riesgo de confundir, sabiduría frente a legitimidad constitucional.

Y continúa exponiéndose que el P.I.P. no cita principio para sostener su posición y el Estado "en modo alguno argumenta que la Ley Núm. 6, *supra*, fuera aprobada bajo el Art. VI, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, relativo a la legislación sobre las elecciones generales. El concepto de sufragio insular restringido no tiene apoyo visible en la Constitución; tampoco en la realidad tal y como acontece ante nuestros ojos". Opinión del Tribunal, pág. 614. ¿En qué quedamos? ¿Es que no tiene valor alguno la exposición de motivos? ¿No se había concluido antes que esta ley "complementa la Ley Electoral vigente y reglamenta escrupulosamente unos comicios . . ."? Íd., pág. 601. ¿Son o no comicios? ¿Bajo qué fundamento se sostiene la aseveración de que la

ción de electores; proceso de votación; escrutinio de papeletas; intervención de la Comisión Estatal de Elecciones, y reglamentación de las contribuciones económicas y su supervisión, contabilidad y gastos.

Constitución —fundada en la realidad percibida a través de los ojos de la mayoría— expande el concepto de sufragio más allá de nuestras playas?

Es peligroso apoyar la validez de la Ley de Primarias Presidenciales Compulsorias en "una página en nuestra historia . . .". Opinión del Tribunal, pág. 618. Su validez no puede condensarse de ese modo, pues "la Constitución debe ser como un ancla que nos proteja de las tempestades y los embates de los vientos de la historia". Mooney, *La elección del Poder Ejecutivo nacional (legalidad versus legitimidad)*, supra, pág. 549. Parafraseando a la mayoría (opinión del Tribunal, pág. 618), ¿qué sectores las perciben como una fuente de influencia del país? ¿Para qué sectores es una estrategia electoral? ¿Quiénes sostienen "que es un instrumento de los partidos mayoritarios para medir sus fuerzas antes de las elecciones de noviembre"? La dificultad de este enfoque es que estas preguntas han sido ya contestadas de una sola forma: los líderes políticos del P.P.D. y P.N.P.

Causa mayor consternación la conclusión de que esta participación y polémica es materia a ser tratada o "discutida . . . [en el] proceso político, en las urnas o en aquellos recintos propios de los organismos representativos del Estado" (opinión del Tribunal, pág. 618) y, por ende, no debe ser resuelta en los tribunales. Se afirma que la "prudencia judicial nos aconseja que sea en la arena legislativa" donde se decida esta controversia. Íd. ¿Significa que la mayoría estima que el asunto no es *justiciable* por ser materia política *(political question)*? De ser así, ¿no estamos en un retroceso jurisprudencial más sobre lo que es materia vedada a los tribunales? Creíamos haber resuelto lo contrario *aun en el epicentro del poder político*, esto es, en el seno de una comisión senatorial —*Silva* v. *Hernández Agosto*, 118 D.P.R. 45, 57 (1986)— en que reafirmamos la "función ineludible de los tribunales *interpretar* la Constitución y *velar que el espíritu y el esquema democrático de esta Carta no se vulnere*". (Én-

fasis suplido.) Véanse: *Vélez Ramírez* v. *Romero Barceló*, 112 D.P.R. 716 (1982); *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977). Después de todo, el *"equilibrio de los poderes*, lejos de resentirse con la intervención de la justicia, se afirma en beneficio de la libertad ciudadana y el buen gobierno, aclarando que ese equilibrio, tan mentado, *no ha sido instituido sólo para impedir que se lastimen los poderes entre sí* —lo cual es muy importante—, *sino fundamentalmente, para preservar los derechos irrenunciables de la personalidad humana.* Es por ello que no puede sostenerse —aun concediendo que siempre los 'poderes políticos' *traduzcan la voluntad de sus electores*— la tesis de la interpretación final por cada poder, pues la *Constitución quedaría seguramente triplicada. ¿Se imaginan Uds. un orden jurídico de ese jaez"?* (Énfasis suplido.) L.M. Boffi Boggero, *Reflexiones sobre el Poder Judicial,* 1978-B Rev. Jur. Arg. La Ley 848, 850 (1978).

Finalmente, se afirma que los "partidos políticos *locales* concurren a las elecciones bajo muy precisas orientaciones políticas. Estos reflejos electorales cristalizan en legislación [y p]retender que estas orientaciones no respondan al sentir del sector mayoritario del electorado puertorriqueño se opone a todos los esquemas teóricos y constitucionales esbozados". (Énfasis suplido.) Opinión del Tribunal, pág. 615. No dudamos de las orientaciones políticas precisas de los partidos *locales.* Sin embargo, ¿que relación tienen los resultados de las elecciones generales del pasado con la creación legislativa de los partidos políticos afiliados a los nacionales? ¿Cuándo se consultó a *todo el electorado puertorriqueño* en unas elecciones generales, u otro tipo de consulta electoral válida, la deseabilidad de institucionalizar y patrocinar oficialmente las primarias presidenciales? Bajo esta visión, ¿por qué no derogar otros derechos de linaje constitucional cuando la mayoría así lo desea? La Constitución proclama el bienestar, la dignidad e integridad física de todos. Ante el

auge de criminalidad y el deseo mayoritario, ¿estaría autorizada la Asamblea Legislativa a instaurar estatutariamente la pena de muerte o eliminar el derecho a la fianza?

Discrepamos no sólo de esa metodología, sino de la sustancia del enfoque mayoritario. "Una cosa es lo que la matemática electoral permite en la frialdad marmórea de las normas, y otra, lo que la realidad fáctica [(7)] tolera." Mooney, *La elección del Poder Ejecutivo nacional (legalidad versus legitimidad)*, supra, pág. 548. En aras de sostener las primarias, han sacrificado principios elementales electorales, han revivido la desprestigiada doctrina de abstención judicial por cuestiones políticas y, sobre todo, han consagrado la regla de que una mayoría puede enervar los derechos de las minorías sin sujeción a la Constitución.

Dicho con el mayor respeto, tenemos la impresión de que el Tribunal ha examinado un legajo constituyente y ha interpretado una Constitución distinta a la aprobada en el 1952.

Bajo la misma, no existe un mandato mayoritario, expreso y previo que les obligue, producto de un *referéndum, plebiscito o enmienda constitucional* —en que se le haya dado la oportunidad de votar a favor o en contra a todos los electores capacitados del país— sobre la trascendental decisión de incorporar al proceso eleccionario puertorriqueño — *financiado y pagado por todos sus contribuyentes*— un reconocimiento a los trámites internos y gestiones de los partidos nacionales de Estados Unidos con miras a lograr alguna participación colectiva en la nominación de candidatos a presidente y vicepresidente. Ello vulnera el principio igualitario que sirve de fundamento y premisa elemental para *sostener la legalidad de los desembolsos de unos fondos*

---

(7) *Fáctica:* "(Del lat. *factum,* hecho.) adj. Perteneciente o relativo a hechos. *2.* Basado en hechos o limitado a ellos, en oposición a teórico o imaginario." *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. 1, pág. 626.

*públicos.* Esos fondos no están asequibles a todos en las urnas, en la lid electoral en que se miden, en igualdad de condiciones, las alternativas ideológicas o decisiones fundamentales que constituyen un cambio o una redefinición de las relaciones básicas entre Puerto Rico y Estados Unidos, según la Constitución.

## IV

Para apreciar las profundas ramificaciones constitucionales aplicables al caso de autos, es menester exponer varias premisas incuestionables.

*Primera,* distinto a los estados de la Unión Norteamericana, en Puerto Rico *no existe el derecho a votar por el Presidente de Estados Unidos. Segunda, el proceso electoral y político en Puerto Rico presenta unas variantes únicas debido a su peculiar condición político-constitucional y el debate continuo de su destino final. Tercera,* la "Constitución y las leyes generalmente tienen el propósito de resolver situaciones de carácter interno del país y no para aplicarle a condiciones externas". *Green Giant Co.* v. *Tribunal Superior,* 104 D.P.R. 489, 496 (1975). *Cuarta,* como consecuencia de nuestra singular situación política, no es posible acudir a precedentes de otras latitudes para evaluar y avalar la constitucionalidad de la ley. Y *quinta,* para quienes no quieren reconocer "esta realidad, resulta difícil aceptar y comprender cómo ciertos fenómenos y movimientos de la política partidista norteamericana, independientemente de su sabiduría o atractivo, *no pueden constitucional y válidamente trasplantarse automáticamente al país sin garantizar los distintos sectores de opinión". P.I.P.* v. *E.L.A.,* supra, pág. 418.

Ayuda a apreciar este análisis el conocer la naturaleza, el alcance y los efectos de unas primarias. De la definición genérica de la Ley Electoral se colige que es el procedimiento mediante el cual los electores de los partidos políticos nominan sus candidatos a cargos públicos *electivos.* 16 L.P.R.A.

sec. 3003(46). Es, pues, *un asunto eminentemente político en el cual los miembros de determinado partido expresan su preferencia*. En este sentido, unas primarias sustituyen los *caucus*, peticiones o convenciones nominativas como medio de nominar candidatos. En Estados Unidos aproximadamente más de la mitad de los estados se rigen por una Ley de Primarias. Los restantes, por el mecanismo de *caucus* o convenciones de partidos. La Ley de Primarias Presidenciales Compulsorias recoge esa visión. Las define como "el proceso mediante el cual los electores emiten su voto para expresar su preferencia en *cuanto a los candidatos a la nominación para la presidencia de los Estados Unidos por el partido de su afiliación*" —(énfasis suplido) 16 L.P.R.A. sec. 1322(ñ)— y para elegir delegados y delegados alternos a las convenciones nacionales nominadoras.

"Como evento que involucra un segmento sustancial de la población, *todo proceso de primaria genera ura campaña publicitaria, directa e indirecta, remunerada y gratuita. El atractivo de los nombres y símbolos adoptados, las posiciones de los candidatos y los intercambios de ideas, encuentran cabida, expresión y eco en la prensa radial, escrita y televisada del país*. La audiencia electoral aumenta. Las primarias, en su fase preparatoria y eleccionaria, producen entusiasmo entre los seguidores de los distintos candidatos y partidos políticos. Constituyen un *medio efectivo de propaganda* para mantener activa la agrupación política, y vivas las controversias de importancia. *En ese sentido los estudiosos reconocen que toda primaria representa un vehículo positivo de proselitismo político para partidos y candidatos ganar adeptos a sus causas." P.I.P.* v. *E.L.A.*, supra, págs. 418–419.

"La . . . Ley de Primarias Presidenciales Compulsorias, en términos generales, [fundada en el *Preámbulo de la Constitución*] refleja la intención de la Asamblea Legislativa

. . . de darle mayor participación pública a los [ciudadanos] interesados en participar de algún modo, en el proceso de nominación y selección de candidatos presidenciales de los Estados Unidos. Intenta regular y establece[r] un sistema de primarias presidenciales *obligatorias* en Puerto Rico *para canalizar pacíficamente* la expresión [ciudadana en Puerto Rico a través de] la elección de delegados y sus alternos a la Convención Nacional nominadora de los partidos nacionales. . . . Su Exposición de Motivos, en síntesis expresa: que la participación de los puertorriqueños en los procesos preliminares en los Estados Unidos está en consonancia con el preámbulo de nuestra Constitución; . . . que la ciudadanía en general ha expresado un interés en particular; que hay la necesidad imperiosa de reglar y sistematizar, ordenadamente y sin riesgos dicho proceso; y que para ello [es] menester asignar fondos públicos caracterizándose [su] erogación . . . como uno permisible constitucionalmente." (Énfasis suplido y en el original.) *P.I.P.* v. *E.L.A.*, supra, pág. 419. *Este interés legislativo no es suficiente.*

## V

En *P.I.P.* v. *E.L.A.*, supra, la entonces representación legal del Estado invocó que la ley era válida por ser un ejercicio legítimo del Poder Legislativo de regular lo concerniente a las elecciones conforme el Art. VI, Sec. 4 de nuestra Constitución, L.P.R.A., Tomo 1. Hoy, contra todo el esquema legislativo, se niega esa filiación constitucional. Sobre el particular, reconocimos la "amplia facultad [de] la Asamblea Legislativa para promulgar y reglar el proceso electoral, [y] esta autoridad se concede bajo la premisa de que será ejercitada con referencia a elecciones *para candidatos a puestos electivos en Puerto Rico.* IV *Diario de Sesiones de la Asamblea Constituyente*, 2621 (ed. 1961)". (Énfasis suplido.) *P.I.P.* v. *E.L.A.*, supra, pág. 421.

No obstante, a renglón seguido añadimos que dicho poder no podía usarse indiscriminada o arbitrariamente. Como veremos más adelante, la Asamblea Legislativa —con todas las enmiendas introducidas a la ley— todavía no ha podido superar el hecho de que *"realmente ha creado por ficción unos partidos adicionales que no existen como tal, pues sus miembros necesariamente salen de las filas de los partidos principales locales puertorriqueños.* Anticipamos que ello vulnera el derecho de otros electores basado en la igual protección de las leyes"* —(énfasis suplido) *P.I.P.* v. *E.L.A.*, supra, pág. 421— y que erró el foro de instancia al estimar inaplicable nuestro repertorio jurisprudencial al respecto.

Según indicáramos en *P.S.P.* v. *E.L.A.*, supra, págs. 621–623:

El carácter presuntivo de partidos políticos *bona fide* —con aspiraciones legítimas de postular candidatos para las elecciones generales del país— . . . ha quedado destruido. El nombre no hace la cosa. . . . El concepto *partido político afiliado* a uno nacional, acuñado en la Ley de Primarias Presidenciales Compulsorias, *es extraño al bosquejo y diseño constitucional vigente.* "Desde tiempo inmemorial se ha dicho que una *elección para un puesto público* no es nada más ni menos que la expresión *por electores cualificados* de su candidato preferido." *United States* v. *Classic*, 313 U.S. 299, 318 (1941). (Bastardillas nuestras).

Por circunstancias particulares en la relación política prevaleciente, que no nos corresponde examinar, ni *nuestra Constitución ni la de los Estados Unidos reconocen el derecho a que los electores de Puerto Rico voten por los candidatos a dichos cargos públicos.* En otras palabras, *no somos electores cualificados para votar con relación a dichos cargos ejecutivos federales.* ¿Podría la Asamblea Legislativa [unilateralmente] otorgar dicha cualidad? Al presente nuestra fuente de poder político y público ". . . emana del pueblo y se ejercerá con arreglo a su voluntad, *dentro de los términos del convenio acordado entre el pueblo de Puerto Rico y los Estados Unidos de América."* (Art. I, Sec. 1 Constitución.) *R.C.A.* v. *Gobierno*

*de la Capital*, 91 D.P.R. 416 (1964). En lo que respecta al po-
der de la Legislatura para disponer todo lo concerniente al
proceso electoral y ampliar el contenido y atributo de un voto
creando cargos electivos, esta autoridad política *se extiende
solamente a nuestra Isla y aquellas adyacentes dentro de su
jurisdicción.* Excepto el puesto de Comisionado Residente en
Washington, los resultados de unos comicios electorales en el
país tienen [sólo] alcance constitucional y jurídico insular
(Art. VI, Sec. 4, Constitución), y no *extraterritorial.* (Escolio
omitido, énfasis suplido y en el original.)

Es el Comisionado Residente quien, según la arquitec-
tura del Estado Libre Asociado —conforme la Ley de Rela-
ciones Federales— tiene el "derecho a reconocimiento oficial
como tal Comisionado por todos los departamentos del Go-
bierno de los Estados Unidos". 1 L.P.R.A. sec. 36. Dicho fun-
cionario es el llamado a promover y gestionar ante el
Presidente, sus oficinas y otros funcionarios federales, toda
la agenda política aludida por el Hon. Miguel Hernández
Agosto en su mensaje de 25 de enero de 1988 antes trans-
crito.

La Ley de Primarias Presidenciales Compulsorias atenta
contra el principio constitucional de territorialidad.

El ingrediente medular tutelado en el voto de todo elector
—de carácter universal, igual, directo, secreto y libre de coac-
ción, según proclamado en la Sec. 2 del Art. II de la Carta de
Derechos— y como corolario, el obtener colectivamente una
franquicia electoral como medio de garantizar la expresión de
la voluntad de un pueblo, *presupone que ese voto, en última
instancia, será ejercitado y tendrá realmente un valor y efi-
cacia en la elección [directa] de determinados candidatos a
puestos públicos.* Desprovisto de esa característica, ingre-
diente, consecuencia y valor, *subsiste solamente como expre-
sión privada, sin que le acompañe un efecto político-público
fuera de las latitudes, jurisdicción o fronteras en que se de-
senvuelve el cuerpo político soberano.*

. . . . . . . .

El diseño constitucional electoral existente en Puerto Rico no lo autoriza. La Asamblea Legislativa no puede por *fiat* extender credenciales ni *status* de partido político *a agrupaciones cuyos integrantes no tienen el derecho a votar por unas posiciones ejecutivas a nivel federal en los Estados Unidos independientemente de la sabiduría o no de dicho fin.* Tal actuación carece del elemento consustancial e imprescindible soberano del cual dimana un poder público de esta naturaleza. *La Ley . . . es un mecanismo extraconstitucional negativo de los axiomas antes apuntados.*

Estas circunstancias a juicio nuestro despojan el carácter público de la empresa y destruyen la validez y legalidad de la asignación y desembolso de los [$1,500,000] y el uso de facilidades y personal de la Comisión Estatal de Elecciones en tales elecciones. . . . (Énfasis suplido.) *P.S.P.* v. *E.L.A.,* supra, págs. 623–624.

Claro está, como allí dijimos, la inconstitucionalidad de la Ley de Primarias Presidenciales Compulsorias no impide al Estado que, en el descargo de su obligación de otorgar protección a toda reunión pacífica de cualesquiera ciudadanos en el ejercicio de su derecho de asociación y expresión, provea para "la protección necesaria para evitar actos de violencia como los señalados en el historial de la ley". *P.S.P.* v. *E.L.A.,* supra, pág. 624.

## VI

Igual ocurre hoy día. Las agrupaciones demócratas y republicanas locales no son partidos dentro del esquema constitucional vigente. No caen bajo la sombrilla constitucional electoral. *Legislativamente no tienen "propósito [alguno en] participar en las elecciones generales del país ni [de] colabora[r] en la selección local y general de funcionarios a puestos públicos en Puerto Rico.* Sí colabora[n], de manera indirecta y sujeta a múltiples contingencias, en la selección de uno de los posibles candidatos a nominaciones para la Presidencia de los Estados Unidos por determinado partido

nacional". *P.I.P.* v. *E.L.A.*, supra, pág. 423. Pero, "el ejercicio de un elector de su preferencia presidencial en las primarias, bajo esta ley, no es otra cosa que el votar en una *consulta* de quien a su juicio, en última instancia, debe ser seleccionado para presidente. *Es un voto que permanece en el umbral del proceso.* Desde este prisma podemos concluir que todo proceso primarista que intenta reglar el ejercicio de un voto sobre puestos públicos en los cuales los electores no pueden constitucionalmente votar, es uno [*sic*] *fallido*, que según veremos, goza más bien de la característica de consulta o *referéndum*, para lo cual es menester proveer unas garantías especiales a los opositores. Puede exigirse responsabilidad, consecuencias y acatamiento a los resultados de los procesos eleccionarios del país, referéndums o plebiscitos *cuando éstos no son discriminatorios y se han caracterizado por condiciones de razonable igualdad no presentes en la ley que nos ocupa*". (Énfasis suplido.) *P.I.P.* v. *E.L.A.*, supra, pág. 425.

Tampoco "toma en cuenta [la ley,] que *en ningún momento [ha habido una] consulta plebiscitaria . . . sobre la participación y votación en los procesos de primarias presidenciales de los partidos nacionales*, que según reconocido, intenta como última consecuencia, tener algún efecto en la elección del presidente de los Estados Unidos. La [validez de la ley] sólo puede [argumentarse] si se acepta la hipótesis, a nuestro entender errónea, de que el voto presidencial fue expresamente autorizado en el año 1967. *Además, el que las primarias sean compatibles con la estadidad federada o la autonomía, no faculta a la Asamblea Legislativa a promulgar leyes discriminatorias contra los electores independentistas.* Bajo el razonamiento que se nos ofrece, se tiende a dar la impresión de que el referido plebiscito de 1967 —en que resultó vencedora la fórmula del Estado Libre Asociado— perpetuó dicho [*status*], y por ende no puede some-

terse al electorado una nueva consulta en torno a posibles cambios, parciales o totales, en la relación política, incluyendo la estadidad federada o independencia". (Énfasis suplido.) *P.I.P.* v. *E.L.A.*, supra, pág. 424.

El legítimo interés de los miles de ciudadanos en que se predica la ley, esto es, "'de seleccionar libremente las personas que habrán de representarle en la confección del programa de gobierno de cada Partido Nacional'", para mejorar las influencias —según opinión del Tribunal, pág. 596— tampoco es suficiente. Bajo esta premisa, ¿podía la Legislatura extender la participación e involucrar al electorado de Puerto Rico en el proceso de primarias que seleccionan a los candidatos al Congreso que, a manera de ejemplo, se han mostrado favorables a las necesidades del pueblo de Puerto Rico o representan unos segmentos sustanciales de compatriotas que residen en New York, Chicago u otras partes del continente? ¿No se convierte entonces la democracia, al decir de Borges, en *"un abuso de la estadística"*? (Énfasis suplido.) Citado por Mooney, *La elección del Poder Ejecutivo nacional (legalidad versus legitimidad)*, supra, pág. 545.

No es persuasivo el énfasis que el foro de instancia le atribuyó a la Asamblea Legislativa —y este Tribunal endosa— de que existe un interés predominante de "asegurar un sistema de votación racional, seguro y confiable que permita que dichos procesos se lleven a cabo con seguridad y en un ambiente de paz social". Apéndice, pág. 1. La dificultad de esta proposición es que se ha impuesto un sistema obligatorio sobre un evento *extraconstitucional*, que no tiene repercusiones en nuestras elecciones, a base de la limitada experiencia habida hace más de una década, en 1976.

## VII

"Reafirmamos la opinión de que tanto la nueva Ley como la asignación de fondos y la participación de la maquinaria

gubernamental, violenta la igual protección de las leyes a los electores miembros del Partido Independentista Puertorriqueño y otras personas que se oponen a la celebración de las primarias presidenciales en Puerto Rico." *P.I.P.* v. *E.L.A.*, supra, pág. 426.

En *P.R.P.* v. *E.L.A.*, 115 D.P.R. 631, 637–638 (1984) resolvimos:

> El principio de igualdad electoral es continuo. Su génesis la encontramos en la Sec. 6 del Art. IX —Disposiciones Transitorias— de la Constitución. Reza:
>
>> Los partidos políticos continuarán disfrutando de todos los derechos que les reconozca la ley electoral, siempre que reúnan los requisitos mínimos exigidos para la inscripción de nuevos partidos [políticos] por la ley vigente al comenzar a regir esta Constitución. La *Asamblea Legislativa,* cinco años después de estar en vigor la Constitución, *podrá cambiar estos requisitos, pero cualquier ley que aumente los mismos, no será efectiva hasta después de celebrada la elección general siguiente a la aprobación de la misma.* (Énfasis suplido.)
>
> Al interpretarla percibimos que su espíritu trasciende su carácter temporal para dar cabida permanente al postulado rector que impregna la Carta de Derechos de la Constitución de que en una sociedad democrática todos los electores y partidos políticos "gozarán de iguales derechos". 4 Diario de Sesiones de la Convención Constituyente 2627 (1952).
>
> *Hoy en día no se discute cómo las Secs. 1 y 2 de la Carta de Derechos le imponen a la Asamblea Legislativa unas limitaciones al ejercicio de su amplia facultad para reglamentar la formación de los partidos políticos.* Durante el cuatrienio en que aprueba la pieza legislativa no puede poner en vigor cambios que aumenten los requisitos de inscripción. Cualesquiera de tales modificaciones sólo pueden tener vigencia pasadas las elecciones generales ulteriores.
>
> El principio igualitario expuesto intenta disuadir que en determinada época un partido, que controla mayoritariamente los poderes ejecutivo o legislativo, o lo comparta con otro —mediante anuencia o consenso— limite el nacimiento de otros

partidos. *También pretende evitar que se agrave la situación de los partidos de oposición existentes, o introduzca cambios de cualesquiera forma en las leyes y reglas que rigen la contienda electoral en beneficio y ventaja de determinado partido, en perjuicio de aquellos existentes o por inscribirse.*

*Como principio general aquella legislación que tienda a hacer onerosa y afectar negativa y sustancialmente las potencialidades de los partidos contrarios minoritarios o los partidos nuevos, o a crear situaciones de inferioridad, puede ser susceptible de impugnación constitucional.* (Énfasis suplido.)

¿Qué tangencia y efectos tienen estos principios constitucionales sobre la Ley de Primarias Presidenciales Compulsorias?

"Hemos dicho que mediante dicha ley, la Asamblea Legislativa 'realmente ha creado por ficción unos partidos políticos *adicionales* que *no existen* como tal, pues *sus miembros necesariamente salen de las filas de los partidos principales locales puertorriqueños*'. (Énfasis nuestro.) Adicionalmente, hemos sostenido que el *'proceso primarista sobre candidatos a las elecciones presidenciales en los Estados Unidos . . . promueve la estadidad o la autonomía [y que] [e]s irreconciliable con el ideal de la independencia'."* (Énfasis suplido.) *P.I.P.* v. *E.L.A.*, supra, pág. 427. Estas expresiones y su impacto jurídico-constitucional actual ameritan cierta elaboración.

Al momento de aprobarse la primera Ley de Primarias Presidenciales Compulsorias y la vigente, existían en el panorama político puertorriqueño tres partidos principales, a saber, el P.N.P., propulsor del ideal de la estadidad federada; el P.P.D., promotor de la autonomía, y el demandante apelante P.I.P., impulsor del ideal de la independencia.

Por circunstancias que no nos compete evaluar, la realidad aceptada es que para la inscripción, elecciones internas, y sobre todo, para las primarias exigidas por la ley, la mayo-

ría de los candidatos y personas propuestas son miembros prominentes de la Asamblea Legislativa o funcionarios públicos del presente o pasado inmediato, que representan o están vinculados con el P.P.D. o el P.N.P., partidos políticos mayoritarios que han dominado la Legislatura y el Poder Ejecutivo de una u otra forma desde 1977. *Dos facciones — estadista y estadolibrista— que si bien se disputan el control interno del llamado Partido Demócrata de Puerto Rico,* son sus únicos beneficiarios.

Tomamos conocimiento judicial de que, en la promoción de la actividad, toda la campaña publicitaria de los voceros del P.N.P. se proyecta sobre la base y el mensaje expreso de que la participación en las primarias representa un voto contra el P.P.D. y a favor de la fórmula de estadidad. Por otro lado, el P.P.D. niega que tal votación aproxime al país hacia la estadidad. Más bien proclama que es para derrotar al P.N.P., sus posibles candidatos a la gobernación y afianzar sus relaciones con el aspirante a la presidencia por el Partido Demócrata nacional. *El enfoque netamente partidista no es nuevo.* I.E. Alegría Ortega, *La Comisión de Status de Puerto Rico: Su Historia y Significado*, San Juan, Ed. Universitaria, U.P.R., 1982, págs. 101–135.

La campaña de orientación, la participación y los pronunciamientos públicos de estos líderes, junto con la comparecencia, la propaganda y los endosos de los candidatos principales a delegados en propiedad y delegados alternos, destaca el hecho incuestionable de que la jerarquía y directiva propuesta por ambos partidos (P.N.P. y P.P.D.) es sustancialmente *una misma.* Debe tenerse presente "que las estructuras jurídicas son tan s[ó]lo medios instrumentales y que los resortes vitales están en las actitudes y en las conductas. O no están en ningún lado". Mooney, *Comentarios al "Estatuto de los Partidos Políticos",* supra, pág. 772.

Esta semejanza no es accidental. *Es producto de la alquimia legislativa basada en la mezcla de materias rojas y azules.* Los partidos políticos afiliados son una *ficción* e inventiva del Legislador. Sus miembros se nutren de los electores inscritos que pertenecen o sienten simpatías por el P.N.P. o el P.P.D. La opinión mayoritaria nos señala que el "gobierno en el Estado moderno tiene que ser un ente activo y creador". Opinión del Tribunal, pág. 607. Aceptamos esa proposición, pero rechazamos por "[in]admisible que el Estado se erija en fundador de partidos". J.R. Vanossi, *Los partidos políticos y los presupuestos de la democracia,* 1980-D Rev. Jur. Arg. La Ley 1285, 1294 (1980). La semblanza aludida pone de manifiesto los extremos siguientes. Primero, por su manifiesta incompatibilidad, no podemos decir que se vigoriza con electores independentistas. Segundo, los partidos políticos *afiliados* están siendo controlados y dirigidos —además de necesaria y sustancialmente nutridos— por los dirigentes y los electores miembros de los partidos que ostentan o han tenido las riendas del Gobierno y controlado la mayoría en la Asamblea Legislativa y el Poder Ejecutivo. Tercero, la radiografía de la estructura y miembros de los partidos políticos afiliados concluyentemente demuestra que son unos álter ego —por así decirlo, un espejo— de los dos partidos políticos principales que controlan la mayoría representativa en las cámaras legislativas. Aunque la ley no le atribuye e intenta negar efectos plebiscitarios, ciertos candidatos presidenciales del Partido Republicano nacional y sus líderes, al igual que algunos de los aspirantes a dirigir el Partido Demócrata local, han reclamado y reiterado que la participación en ambas primarias es un paso hacia la estadidad federada. La conclusión es innegable. *Los denominados partidos políticos afiliados son unos instrumentos de proselitismo político de los dos partidos mayoritarios P.N.P. y*

*P.P.D., cuyos propósitos extraconstitucionales logran a través de las primarias.*

Para la óptica de un observador imparcial, los efectos negativos de los principios constitucionales antes esbozados comienzan a perfilarse.

En primer lugar, la Ley de Primarias Presidenciales Compulsorias implica que de la noche a la mañana, por decreto legislativo, se hizo viable la creación de partidos políticos y se les confirió esa categoría —aunque con fines limitados a las consultas de primarias presidenciales— *a dos partidos pro estadista o autonomista que, sin necesidad de participar en las elecciones generales, reciben y son acreedores a todos los beneficios económicos —directos e indirectos— y de propaganda partidista, que según hemos visto conlleva el proceso primarista con fondos públicos.*

En segundo término, para llevar a cabo los eventos primaristas de dichos partidos afiliados, no sólo se proveen fondos públicos a la maquinaria gubernamental, sino que la ley, *al ponerse en vigor, amplía los límites de contribuciones económicas que las personas naturales y jurídicas pueden hacer en Puerto Rico para fines de política partidista. Ello significa un aumento en la capacidad de recolecta económica de los partidos políticos principales, P.N.P. y P.P.D. —que los controlan— sobre el P.I.P.* El Art. 29 de la Ley de Primarias Presidenciales Compulsorias, 16 L.P.R.A. sec. 1349, permite contribuciones económicas para tales partidos políticos afiliados, adicionales a las aportaciones autorizadas en el Art. 3005 del Título III de la Ley Electoral, 16 L.P.R.A. sec. 3105. Es un hecho aceptado que "los adelantos técnicos de comunicación rápida, directa y masiva, [que] el libre intercambio y la fluidez de ideas y la discusión en torno a los asuntos públicos y las cualificaciones de los candidatos, dependen en gran medida de la capacidad económica de éstos y los partidos políticos". *P.N.P.* v. *Tribunal Electoral*, 104

D.P.R. 741, 750 (1976). Ante el carácter de proselitismo pre-
eleccionario que se le adjudica, *ambos partidos aumentan
sus arcas y el potencial de contribuciones voluntarias,*
desde un máximo de $800 durante año no electoral hasta
$1,000 en año de elecciones. *La ventaja no necesita elucida-
ción; la desigualdad es obvia.*

Bajo una perspectiva de estricta juridicidad es evidente
que la Asamblea Legislativa, no sólo de jure, sino de facto —
con la participación activa de sus miembros políticos princi-
pales— ha quebrantado lastimosamente el compromiso de
neutralidad sobre el *status* contraído y plasmado en el Pre-
ámbulo de la Constitución con todos los puertorriqueños. Al
hacerlo, ha variado las reglas electorales vigentes en detri-
mento del partido demandante y de los independentistas del
país. Reafirmamos que este tratamiento, por sí sólo, es con-
trario a nuestra Constitución y suficiente para revocar el de-
creto de la ilustre sala sentenciadora.

También se manifiesta, aunque no de manera taxativa
sino implícitamente, por operación —en las circunstancias
particulares antes expuestas— que la Ley de Primarias Pre-
sidenciales Compulsorias establece unas clasificaciones fun-
dadas en ideas políticas. Divide aquellos electores que
desean participar frente a los que se oponen, sin proveerle
garantías a estos últimos para hacer valer sus objeciones.

Tampoco se ha establecido un interés apremiante que, en
el balance de derechos en conflicto, convalide las primarias.
Situaciones aisladas y mínimas de violencia hace más de una
década no las justifican. La Asamblea Legislativa, sin supe-
rar los aspectos operacionales discriminatorios de esta ley
—proveer las garantías igualitarias necesarias— ha insis-
tido en la misma.

Repetimos.

Las primarias presidenciales intentan delinear y financiar
una mecánica *compulsoria* para que los electores puertorri-

queños que lo desean, a través de unos denominados partidos políticos afiliados a los nacionales, expresen su preferencia sobre qui[é]nes deben ser *nominados* para el cargo de Primer Ejecutivo Federal. *La expresión es . . . inicial e inconclusa.* Goza más bien de carácter consultivo, pues: (a) no es para un cargo público electivo sobre el cual los puertorriqueños puedan ejercitar el voto directo, cualidad requerida en la Constitución; y (b) [los delegados] no vienen compelidos a votar por el candidato que ha recibido la preferencia mayoritaria de los electores. Ello, unido a su obligatoriedad . . . *la asemejan a un referéndum o plebiscito cuya característica principal precisamente es la de consultar al electorado para la "aprobación o rechazo de uno o varios asuntos de interés general".* Art. 1.005(39) [de la Ley Electoral].

. . . . . . . .

Recapitulando, como dijimos en *P.S.P.*, supra:

"Se manifiesta además al caso de autos en varias dimensiones la violación de la cláusula constitucional de igual protección de las leyes consagrada en las Secs. 1 y 2 de nuestra Carta de Derechos. Veamos. Tomamos conocimiento judicial de que en Puerto Rico existen y se debaten básicamente tres pensamientos ideológicos legítimos en cuanto a su destino político como pueblo: la estadidad, autonomía e independencia. Históricamente estos derroteros han formado parte de la aspiración y expresión individual ciudadana, tomado cuerpo colectivo, y previa inscripción, participado como partidos políticos en los procesos eleccionarios generales. También se ha manifestado en consulta plebiscitaria celebrada a los fines de pulsar la opinión pública en determinada época respecto a una redefinición o modificación de las relaciones básicas entre Puerto Rico y los Estados Unidos. *P.P.D.* v. *Ferré, Gobernador*, 98 D.P.R. 338 (1970).

Diluida propiamente la controversia del caso, la realidad expuesta es un punto de vista [contundente y] válido para invocar una desigualdad de tratamiento. En todos estos procesos, por imperativos de unas garantías constitucionales, la ley siempre ha implementado unos mecanismos igualitarios, particularmente en materia de subsidio económico electoral, proveyendo *a todo el electorado del país* la opción de poder democráticamente expresar en las urnas su predilección *sin*

*que se discrimine contra ninguno de los ideales aludidos.* La ejecución de la pieza legislativa que nos ocupa, en lo concerniente al [beneficio y] uso de dineros públicos por uno o más grupos de ciudadanos que no ostentan la franquicia electoral, la campaña publicitaria generada por la orientación que la Comisión Estatal de Elecciones debe llevar a cabo, y el hecho de que en su fondo el participar y votar en tales elecciones presupone, proyecta y presenta una vinculación o endoso con los ideales de la estadidad o de asociación autonómica a los Estados Unidos, representa un discrimen y una ventaja —directa e indirecta— de carácter indebido contra aquellos electores independentistas que no coinciden con dichas aspiraciones y otros ciudadanos que propugnan una tesis política contraria." (Énfasis suplido, en el original y escolio omitido.) *P.I.P.* v. *E.L.A.*, supra, págs. 434-436.

La desigual protección de las leyes se manifiesta, además, vivamente sobre el Partido Independentista Puertorriqueño en virtud del hecho siguiente. Bajo la Ley Electoral vigente dicho partido, como principal, es acreedor a un fondo electoral durante el presente año eleccionario ascendente a $200,000. 16 L.P.R.A. sec. 3116. Al igual que los otros partidos políticos principales, este dinero puede ser utilizado en sus actividades administrativas de campaña y propaganda política, incluso en primarias. 16 L.P.R.A. sec. 3118.

". . . Aunque algunos quieran negarlo, repetimos, el proceso primarista sobre candidatos a las elecciones presidenciales en los Estados Unidos solamente es compatible con la tesis que acepta y promueve la estadidad o la autonomía. Es irreconciliable con el ideal de la independencia. La promulgación por la Asamblea Legislativa de la Ley de Primarias Presidenciales Compulsorias y la creación y reconocimiento de agrupaciones locales como afiliados a los partidos nacionales en Estados Unidos choca contra la tesis política principal del demandante-apela[nte] Partido Independentista Puertorriqueño. Para la campaña de orientación e información por la Comisión Estatal de Elecciones la Asamblea Le-

gislativa proveyó los fondos aquí impugnados, sin embargo, *dejó de equiparar a los electores que componen la minoría independentista con fondos públicos para oponerse a la participación de tales primarias.* En consecuencia, dicha minoría se ha visto [y se verá] forzada a hacer uso de sus economías provenientes de las aportaciones de sus propios miembros y del fondo electoral." (Énfasis suplido.) *P.I.P.* v. *E.L.A.*, supra, págs. 437–438.

Como corolario, al sostener este Tribunal el uso de fondos públicos en las primarias, *significa que para los próximos comicios del país en noviembre de 1988, la paridad económica visualizada en la Ley Electoral, en virtud de fondos públicos, desaparece. Los electores de los partidos políticos principales —P.N.P. y P.P.D. que propulsan la estadidad federada o la autonomía— llevan una ventaja pecuniaria sobre la minoría independentista creada por la ficción de partidos políticos afiliados.*

Conscientes de la realidad expuesta, la Asamblea Legislativa intentó negar el carácter plebiscitario de las primarias. El Art. 32 de la Ley de Primarias Presidenciales Compulsorias dispone:

*Interpretación de los resultados de las Primarias Presidenciales*

Siempre que los procedimientos de primarias presidenciales sean administrados e implementados desde su inicio hasta cumplimentación final por el Presidente de la Comisión Estatal de Elecciones, ni el número de los participantes, ni los resultados de ningún otro elemento del proceso de las mismas y/o demás procedimientos que se lleven a tenor con lo dispuesto en esta [ley] podrá ser oficialmente interpretado por el Gobierno de Puerto Rico para propósito alguno como indicador en relación con las preferencias que tenga o pueda tener nuestro pueblo o un sector del mismo en cuanto al asunto del status político, ni en cuanto a la dirección, si alguna, por la cual deba o pueda encaminarse Puerto Rico en términos de cambios a su actual status. 16 L.P.R.A. sec. 1352.

Esta expresión legislativa es inconsecuente y atenta contra *el derecho vivo*. El abismo es enorme. La campaña publicitaria y de propaganda partidista que generan las primarias y la forma en que han vinculado la simple participación como un paso hacia la estadidad algunos de los candidatos presidenciales y un número sustancial de los aspirantes a dirigir o a ser delegados por los partidos políticos afiliados, *anula el texto de ley antes transcrito. La norma de hermenéutica legislativa choca contra la realidad viva y los pronunciamientos constantes y en contrario de sus autores principales. Es una utopía la abstracción del proceso primarista con el reclamo del ideal de estadidad o de autonomía.*

Sobre tan frágil fundamento, ¿puede sostenerse la interpretación mayoritaria de que ello veda "formalmente toda posible vinculación oficial por parte del Estado entre los resultados de las primarias y la relación jurídica entre Puerto Rico y Estados Unidos"? Opinión del Tribunal, pág. 600. Y paradójicamente, ¿cómo desvincular al Estado Libre Asociado y el ejercicio de su poder de la oficialidad que a través de esta legislación le ha imprimido al proceso primarista norteamericano?

## VIII

Todas estas consideraciones nos mueven a reiterar que la Ley de Primarias Presidenciales Compulsorias adolece de serias e infranqueables deficiencias constitucionales, cuya superación exige la realización de unos trámites por medio de referéndum o plebiscito, no discriminatorios, rodeados de garantías igualitarias legales y económicas para que todos los sectores y electores cualificados del país puedan participar u oponerse. "La vitalidad y funcionabilidad de nuestra Constitución no sujeta la voluntad creadora de la presente y futuras generaciones. Sin embargo, como sabia admonición, refleja que '[l]as constituciones *deben estar fuera del alcance de la pasión súbita y el juicio pasajero* y, siendo ta[n] alto el

fin que ellas cumplen, el procedimiento para enmendarlas debe ser lo suficientemente difícil como para invitar al análisis sereno y cuidadoso'. *Diario, op. cit.*, pág. 2559." (Énfasis suplido.) *Ortiz Angleró* v. *Barreto Pérez*, supra, págs. 113–114.

> Es al pueblo de Puerto Rico, por tanto, a quien corresponde entender directamente en la decisión de su destino político final o en la aprobación de medidas que afecten de modo importante sus relaciones con Estados Unidos. La Asamblea Legislativa del país tiene facultad para disponer plebiscitos no discriminatorios sobre tales medidas o sobre la cuestión general del *status*. La asignación de fondos para tales fines constituye indudablemente una asignación de fondos para fines públicos. La Asamblea Legislativa está desprovista de poder, sin embargo, para legislar en zonas reservadas al pueblo de Puerto Rico, tales como la relativa al voto presidencial a menos que el pueblo la autorice expresamente. Una asignación de fondos para fines no autorizados no solamente infinge la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado, sino también la Sec. 19 del Art. II, relativa a los derechos pertenecientes al pueblo. La asignación . . . [de $1,500,000] invade una zona vedada a la autoridad legislativa. *P.S.P.* v. *E.L.A.*, supra, pág. 609, opinión del Tribunal.

Ninguno de nuestros pronunciamientos debe entenderse como impedimento para que los ciudadanos que así lo deseen participen, por su propio esfuerzo y pecunio, en la consulta y expresión sobre candidatos predilectos a la nominación de la presidencia por los partidos nacionales, al amparo de otras leyes que autorizan el uso de escuelas públicas y bajo la protección de los agentes del orden público, en vista del inmenso número de personas que eventos de esta magnitud conllevan.

## IX

Lo expuesto obliga a preguntarnos nuevamente: ¿DEMOCRACIA o PARTIDOCRACIA? La respuesta es evidente. "Si bien la democracia es un juego de equilibrar con-

cordancias entre todos los sectores representativos, no puede ser que de ello salgan sorpresas como de las calderas de las brujas de Macbeth. Hay que replantear en tal sentido no sólo ya la inteligencia de la Constitución, sino el alcance que damos al vocablo Democracia. . . . [S]i se define mal la democracia, nos exponemos a rechazar algo que no hemos identificado debidamente y a lograr otra cosa que de ninguna manera hubiéramos deseado. Al fin, la democracia es un 'plebiscito de todos los momentos' y ella es algo que se realiza al decir de Couture, 'en la acechanza nuestra de cada día'." Mooney, *La elección del Poder Ejecutivo nacional (legalidad versus legitimidad)*, supra, pág. 553. Hoy, tristemente, ha triunfado la *liturgia* partidista sobre la *fe* en la democracia. Nos recuerda el siguiente pensamiento de Ortega y Gasset:

> La política puede significar dos cosas: arte de gobernar o *arte de conseguir el Gobierno y conservarlo.* De otro modo: hay un arte de legislar y *un arte de imponer cierta legislación.* Pensar qué ley es la más discreta en cada caso y pensar qué medio habría para hacer que esa ley llegue a convertirse en ley escrita y vigente, son cuestiones muy distintas, *pero es menester repetir a toda hora que es un acto inmoral convertirse en conquistador del poder sin crearse previamente un ideal gubernativo.* Cierto: política es acción, pero la acción es también movimiento, es ir de un lugar a otro, es dar un paso, y un paso exige una dirección que vaya recta hasta lo infinito. *Entre nosotros se ha hecho una separación indebida de la política de acción y la política ideal, como si la una tuviera sentido huérfana de la otra. La historia contemporánea de nuestro país ha hecho patente hasta qué punto de miseria puede llegar una política activa exenta de ideal político.* (Énfasis suplido.) J. Ortega y Gasset, *Discurso Político*, Madrid, Ed. Alianza, 1974, pág. 45.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

## I

No hay duda de que este Tribunal es el máximo intérprete de la Constitución del Estado Libre Asociado de Puerto Rico. Ello no quiere decir ni significa, sin embargo, que las decisiones que este Foro emite al respecto, y el razonamiento que en ellas se expone, no estén sujetas a "revisión" por un "tribunal superior", con el cual todos tenemos contraído un compromiso: *la historia*. Ese "tribunal", ese pasar de los años, constituye nuestro más severo crítico, al cual todos los integrantes de este Foro —pasados, presentes, y futuros— le tendrán que rendir cuentas.

Refrendar con nuestro voto la opinión mayoritaria emitida tendría dos efectos: complacer nuestro criterio o preferencia personal y traicionar nuestra consciencia judicial. *Actuamos* —con total objetividad e imparcialidad y, sobretodo, fieles al juramento que prestamos el día que tomamos posesión del cargo que ocupamos— *conforme a esa consciencia judicial*.

## II

Somos del criterio que —independientemente del debate sobre el "poder" que pueda tener el Gobierno de Estados Unidos para disponer unilateralmente de nuestro destino político final, lo cual no está aquí en controversia— el Pueblo de Puerto Rico al adoptar la Constitución del Estado Libre Asociado estableció un fino balance entre los tres pensamientos o ideologías políticas imperantes en nuestro país, esto es, la autonomía, la independencia y la estadidad, reservándose el pueblo, insularmente y bajo nuestra Constitución,

el derecho de decidir sobre ese destino. Ello definitivamente tiene el efecto de impedir que la Asamblea Legislativa de Puerto Rico apruebe legislación, sin consulta previa al pueblo, que tenga el efecto de alterar ese balance o de "lanzarlo" por determinado cauce político.

El planteamiento ante nuestra consideración no gira, como aparentemente entiende la mayoría del Tribunal, alrededor de *la conveniencia o sabiduría* de la Ley de Primarias Presidenciales Compulsorias, sobre lo cual, dicho sea de paso, no tenemos duda. El recurso radicado, por el contrario, requiere que este Tribunal pase juicio sobre *la legalidad* de dicha ley a la luz de nuestra historia y realidad constitucional.

Sobre la ilegalidad de la mencionada ley tampoco albergamos duda alguna. La misma definitivamente infringe el esquema conceptual de neutralidad alrededor del cual se diseñó la Constitución del Estado Libre Asociado de Puerto Rico, constituyendo dicha pieza legislativa un intento solapado de la Asamblea Legislativa de modificar sustancialmente el *status* o destino político de Puerto Rico, facultad específicamente reservada al pueblo.

Tradicionalmente se ha aceptado por todos los sectores y partes envueltas en esta controversia que una solicitud del Gobierno del Estado Libre Asociado de Puerto Rico para que los puertorriqueños puedan votar directamente por el Presidente de Estados Unidos requiere, de nuestra parte, el consentimiento previo del Pueblo de Puerto Rico en votación especial (referéndum) a esos efectos por constituir el mismo una modificación sustancial al derecho que se reservó el pueblo a decidir el destino final de su condición política al amparo de nuestra Constitución.[1]

---

[1] Véanse a esos efectos: La Ley Pública 88-271 de 20 de febrero de 1964 y la Ley de la Asamblea Legislativa Núm. 9 de 13 de abril de 1964 creadora de la

Resulta, a nuestro humilde entender, inconcebible que los proponentes y favorecedores de la validez constitucional de la actuación legislativa aquí en controversia sostengan que la celebración de las primarias presidenciales mediante el uso de fondos públicos no requiera el mismo "tratamiento" que el voto presidencial, esto es, consentimiento previo de nuestros ciudadanos vía consulta especial a esos efectos.

Realmente no alcanzamos a comprender la diferencia entre ambas situaciones. Como recientemente expresara un distinguido miembro del foro puertorriqueño: "La idea de las primarias es *hermana gemela* del voto presidencial. Con la primera *se nomina al candidato* y con la segunda *se elige al nominado*." (Énfasis suplido.)[2]

Ambas situaciones tienen *el efecto* de adelantar o promover los intereses políticos de los partidos que en Puerto Rico propulsan la estadidad y la unión permanente con Estados Unidos en detrimento sustancial de los intereses del partido que, por el contrario, promueve el ideal de independencia como destino político final de nuestro país. Para disipar cualquier duda al respecto, basta una ligera lectura de las expresiones vertidas por el Hon. Miguel A. Hernández Agosto, Presidente del Senado de Puerto Rico, en ocasión de anunciar su candidatura, por la facción del Partido Popular Democrático, a la presidencia del Partido Demócrata y del comunicado de prensa emitido por la Sra. Marlene Gillette, actual copresidenta de dicho partido por la facción del Partido Nuevo Progresista, *sobre las bienandanzas y ventajas*

---

Comisión Conjunta de Estados Unidos y Puerto Rico para estudiar todos los factores que tuvieren que ver con las presentes y futuras relaciones entre EE.UU. y P.R.; Informe de la referida Comisión de agosto de 1966 que recomendó la creación de grupos de asesores ad hoc; Informe del Grupo Asesor Ad Hoc sobre el Voto Presidencial Para P.R. de 18 de agosto de 1971, pág. 1.

[2] Palabras del Lcdo. Noel Colón Martínez tomadas de su artículo publicado en el Periódico Claridad en su edición del 4 al 10 de marzo de 1988, pág. 11.

que representan para sus respectivos partidos el participar en las primarias presidenciales.(³)

De las referidas expresiones, y de incontables otras emitidas por diferentes líderes de los dos partidos políticos de la mayoría que controlan nuestra Asamblea Legislativa, resulta evidente el carácter sectario de las primarias presidenciales. La fuerza motriz que impulsa el proceso primarista lo constituye el interés de los dos partidos políticos de mayoría de lograr acceso a los centros de poder en Washington, D.C., con el propósito de obtener concesiones que favorezcan su gestión, y fortalezcan su posición política en Puerto Rico, lo que tiene el efecto de discriminar contra el sector ideológico que propulsa la independencia para nuestro país.

En ello, *a la luz de nuestra realidad constitucional*, es que radica la violación a la Cláusula de la Igual Protección de las Leyes. La Ley de Primarias Presidenciales Compulsorias —no obstante aparentar ser neutral, no establecer clasificaciones de su faz, y tener el "propósito procesal" de "proveer un sistema racional y seguro que viabilice la participación de los puertorriqueños que lo deseen en las primarias de los partidos políticos de los Estados Unidos a que estén afiliados", y así "asegurar la paz y tranquilidad en dicho proceso"— vulnera la Cláusula Constitucional sobre Igual Protección de las Leyes por razón de que el *propósito* obvio de la Asamblea Legislativa al promulgarla, *y su efecto*,(⁴) es el de alterar el proceso político puertorriqueño, inclinando la balanza a favor de determinados sectores ideológicos en detrimento de otros.

---

(³) Dichas manifestaciones fueron transcritas en su totalidad en la opinión disidente emitida por el compañero Juez Asociado Antonio S. Negrón García en el escolio número 3 de dicha opinión.

(⁴) *Washington v. Davis*, 426 U.S. 229 (1976); *Castaneda v. Partida*, 430 U.S. 482 (1977); *Griffin v. School Board*, 377 U.S. 218 (1964).

Como certeramente expresara este Tribunal en *Marrero* v. *Mun. de Morovis,* 115 D.P.R. 643, 645–647 (1984), en "'la medida en que los fondos públicos se utilicen para propaganda político partidista se está afectando detrimentalmente el derecho de los demás electores'". La finalidad pública que en el presente caso este Tribunal viene en la obligación de proteger debe ser la de evitar que el Estado utilice los fondos públicos del pueblo para inclinar nuestro destino político hacia determinado rumbo. La Ley de Primarias Presidenciales Compulsorias en ese sentido atenta contra nuestra Constitución. En la medida que esto sucede, la misma no puede tener fin público alguno.

La exposición de motivos de dicha ley, en la cual la mayoría de este Tribunal pretende amparar la legalidad de la misma, constituye, a nuestro humilde entender, un simple subterfugio que intenta encubrir una crasa violación a nuestra Constitución. Nuestra función, como máximos intérpretes de ese magno documento, es la de salvaguardar los derechos de todos los que bajo el mismo conviven. *Silva* v. *Hernández Agosto,* 118 D.P.R. 45 (1986).

—O—

Voto particular del Juez Asociado Señor Ortiz al cual se une el Juez Presidente Señor Pons Núñez.

Por los fundamentos allí vertidos, estoy conforme con la opinión del Tribunal por entender que la Ley Núm. 6 de 24 de septiembre de 1979, según enmendada por la Ley Núm. 89 (16 L.P.R.A. sec. 1321 *et seq.*),[1] tiene un fin público al

---

[1] En la Exposición de Motivos de la Ley Núm. 89 de 2 de julio de 1987 (16 L.P.R.A. sec. 1321 *et seq.*) se ratifica el propósito del legislador al aprobar fondos públicos para reglamentar el proceso primarista en la forma siguiente:

"Esta ley pretende además simplificar el proceso y administración de las primarias presidenciales. Se reconoce el derecho de sectores de la comunidad en

asignar fondos públicos para administrar el proceso primarista.

Debo, sin embargo, hacer constar que al así opinar parto de la premisa de que el *ratio decidendi* sobre el alcance de nuestra función judicial es el que se expone en la opinión del Tribunal, pág. 612, al efecto de que:

> Ahora bien, la Constitución, cuerpo de normas supremas, se impone a la legislación ordinaria. Dicho documento, que constituye nuestro proyecto de vida en comunidad, otorga a la Rama Judicial amplios poderes para examinar actuaciones alegadamente inconstitucionales del Poder Legislativo o Ejecutivo, al amparo de la relación dinámica de la separación de poderes. *Silva* v. *Hernández Agosto*, 118 D.P.R. 45 (1986).

Sostengo, además, que aun bajo el prisma más amplio sobre la función judicial al interpretar estatutos cuya validez constitucional se pone en entredicho que utilizamos en *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1978), la legislación bajo consideración es válida. Como muy acertadamente señala la opinión del Tribunal, uno de los propulsores de la ley, el Senador Orestes Ramos, aclaró debidamente cuál es el verdadero alcance de la misma y cuál es su fin público. Véase XXXIII(1) Diario de Sesiones de la Asamblea Legislativa (Senado) 173 (1979), citado en la opinión del Tribunal, págs. 600–601.

Estoy conforme, además, porque para mí es determinante y parte esencialísima de la función judicial el principio rector que se particulariza en la opinión en la forma siguiente:

---

participar en estos procesos electorales. A la vez, la Asamblea Legislativa establece un justo balance entre ese interés de participación ciudadana, y el interés de que estos procesos finalicen de una manera que la comunidad en general pueda adecuadamente centrar su atención en los asuntos electorales locales. Así garantizamos su derecho de emitir un voto informado, a través del cual cada ciudadano exprese los dictados de su conciencia." 1987 Leyes de Puerto Rico 375–376.

La Ley Núm. 89 se originó en la Cámara de Representantes al presentarse por su Presidente, señor Jarabo, el P. de la C. 1113.

La participación de las agrupaciones políticas puertorriqueñas en los procesos de los partidos políticos norteamericanos ya ocupa una página en nuestra historia y ha sido motivo de mucha controversia. Por un lado, dicha participación es percibida por importantes sectores del pueblo como una fuente adicional de influencia y acceso a la estructura política norteamericana. Para otros sectores constituye una estrategia electoral de los partidos políticos principales, cuyo propósito es integrar el proceso político de Puerto Rico al de Estados Unidos. También hay quien sostiene que es un instrumento de los partidos mayoritarios para medir sus fuerzas antes de las elecciones de noviembre. En cualquiera de los casos, la experiencia de la pasada década demuestra que esta polémica trata de una materia a ser discutida propiamente dentro del proceso político, en las urnas o en aquellos recintos propios de los organismos representativos del Estado. La prudencia judicial nos aconseja que sea en la arena legislativa y no en el foro judicial donde se ventile inicialmente esta controversia. Opinión del Tribunal, pág. 618.

A mi modo de ver este caso es un ejemplo viviente de la sabiduría de dicha norma de abstención judicial.(2)

La Ley Núm. 6, *supra*, fue aprobada luego de un extenso y en ocasiones acalorado debate político. La entonces minoría representativa del Partido Popular votó en contra del proyecto por las razones, entre otras, expuestas por la Senadora Celeste Benítez y el Senador Cancel Ríos, que procedemos a citar:

SRA. BENÍTEZ: Señor Presidente, muy brevemente, la oposición del Partido Popular Democrático a esta medida, está

---

(2) En cuanto a la interrogante planteada en la opinión disidente no creo que en la opinión del Tribunal, ni esa es mi posición, apreciemos que el asunto no es justiciable por ser materia política. En este caso específico dicho pronunciamiento sólo es uno de los factores que podemos y debemos utilizar al considerar si existe o no un fin público. Bajo ningún concepto estamos invocando el desusado criterio sobre cuestión política a los efectos de la jurisdicción y competencia de los tribunales. No puede haber duda de que tenemos jurisdicción sobre la materia.

ampliamente documentada en los frecuentes e interminables debates que este tipo de legislación viene creando, suscitando aquí en el Hemiciclo del Senado desde el año de 1977, en que comenzó esta Octava Asamblea Legislativa de la cual la presente Sesión Extraordinaria es parte. En una y otra ocasión desde enero de 1977, en varias ocasiones este tipo de medidas en torno a la celebración en Puerto Rico de Primarias Presidenciales ha suscitado largos debates que contienen en el Diario de Sesiones y en los documentos pertinentes los argumentos que el Partido Popular Democrático ha presentado en oposición a estas medidas. En adición a la argumentación verbal hemos sometido numerosos votos explicativos en distintos momentos del proceso parlamentario que contienen igualmente los puntos de vista nuestros en oposición a esta medida. Yo no voy a fatigar los oídos de mis compañeros haciendo una nueva enumeración de nuestra posición en torno a este tipo de proyectos. Sí quiero señalar brevemente que este Sustitutivo al P. de la C. 1198 en adición a contener todos los vicios que hemos señalado ya en ocasiones anteriores respecto a la celebración de Primarias Presidenciales, básica y fundamentalmente va encaminado a buscarle la vuelta a la decisión que emitiera nuestro más Alto Tribunal, el Tribunal Supremo del Estado Libre Asociado de Puerto Rico en octubre de 1978, haciendo inconstitucional el uso de fondos públicos para la celebración del tipo de primarias que contempla el P. de la C. 1198. Específicamente el Artículo 32 de este Proyecto a la página 28 del mismo, está redactado con el único y exclusivo propósito de burlarse de la decisión emitida por nuestro más Alto Tribunal en octubre de 1978. Esta manera de legislar para reirse de las decisiones de la más Alta Corte del país es, ciertamente, un ejemplo de cinismo legislativo que este partido no puede tolerar, que este partido no puede auspiciar con un voto en favor de ese tipo de legislación.

. . . . . . . . .

SR. CANCEL RÍOS: Señor Presidente y distinguidos compañeros Senadores. Vamos a votar en contra de la medida por las razones de peso que expresara a nombre de nuestra representación la distinguida compañera doña Celestita Benítez y, además, queríamos hacer unas expresiones de protestas para

llevarlas al récord por la forma y manera en que este Proyecto se ha traído ante la consideración del Senado. Pero antes de hacer esos señalamientos, yo quiero decir que el distinguido compañero Senador don Danny López se ha encargado de aclarar para el récord que lo que se dice en el Artículo 32 de este Proyecto es totalmente falso, que son meras palabrerías.

El Artículo 32 de la medida que como bien apuntaba mi querida compañera Senadora, doña Celestita Benítez, tiene el propósito de supuestamente enfrentarse a una decisión del Tribunal Supremo de Puerto Rico y que volverá a pasar juicio en torno a esta medida. El Artículo 32 dice lo siguiente mi distinguido compañero Senador don Danny López Soto: "Siempre que los procedimientos de Primarias Presidenciales sean administrados e implementados desde su inicio hasta su cumplimentación final por el Administrador Estatal de Elecciones, ni el número de los participantes ni los resultados de ningún otro elemento del proceso de las mismas y/o demás procedimientos que se lleven a ten[o]r con los dipuesto[s] en esta ley, será oficialmente interpretado por el Gobierno de Puerto Rico para propósito alguno como indicador en relación con las preferencias que tenga o pueda tener nuestro pueblo o un sector del mismo en cuanto al asunto del status político ni en cuanto a la dirección, si alguna por la cual deba o pueda encaminarse Puerto Rico en términos de cambios a su actual status."

Esto lo dice el Artículo 32, pero la meta, el propósito, el fin de esta medida lo ha explicado muy claramente el distinguido compañero Senador don Danny López y esto se queda para el récord de esta medida. Porque esta medida es, persigue el mismo propósito que constante y continuadamente ha tratado de estar haciendo el Gobierno actual de Puerto Rico. De torpedear en sus mismas bases el Estado Libre Asociado de Puerto Rico, sin haber tenido un mandato a través de una consulta plebiscitaria en el pueblo Puertorriqueño. Y no es asunto de que unos grupos privadamente por su propia cuenta digan representar a un partido nacional, sea demócrata o sea republicano, el asunto que está contenido en esta medida es que se cogen fondos públicos y todo un personal y se monta todo este proceso de Primarias Presidenciales dentro de la ley que aprobáramos aquí para administrar el proceso electoral del

país, y se le da poder al Administrador General de Elecciones para supervisar y bregar con todo este proceso personal y fondos públicos y eso no se puede hacer y yo me alegro que el compañero Danny López en forma clara haya aclarado cuál es el propósito de esta medida que no es otro, sino que no sea el de en última instancia seguir caminando o encaminando contra la voluntad del pueblo de Puerto Rico mayoritaria al país, hacia la Estadidad. XXXIII(1) Diario de Sesiones de la Asamblea Legislativa (Senado), *supra*, págs. 6–7 y 8–9.[3]

Claro está, la posición que en ese entonces sustentaba dicho partido político no fue acogida por la mayoría. Por las razones ya conocidas, este Tribunal mantuvo la posición de la entonces mayoría parlamentaria y del Ejecutivo. *P.I.P.* v. *E.L.A.*, 109 D.P.R. 403 (1980).

Este evento histórico hace evidente la sabiduría de la norma, que hoy reiteramos, de abstenernos de intervenir para emitir criterios sobre la razón de ser de las decisiones en los asuntos puramente políticos. Esta dinámica decisional de los partidos políticos está sujeta a continuos cambios, tanto en sus propósitos como en sus pensamientos, que a su vez están sujetos a las realidades históricas y políticas del momento.

Al dar mi conformidad, bajo ningún concepto se puede entender que estoy propiciando que claudiquemos nuestro rol vital de ser el último y decisivo intérprete de la Constitución y las leyes locales.

---

[3] La votación final en el Senado fue de catorce (14) votos a favor de la medida y siete (7) en contra, bajo líneas estrictamente partidistas. XXXIII(1) Diario de Sesiones de la Asamblea Legislativa (Senado) 25 (1979).

—O—

Voto de conformidad del Juez Presidente Señor Pons Núñez.

Estamos conformes con la opinión de este Tribunal y con las expresiones del Juez Asociado Señor Ortiz contenidas en su voto particular.

No obstante deseamos, adicionalmente, compartir algunas reflexiones mínimas sobre nuestra Constitución, su interpretación y otras cuestiones que suscita la controversia ante nos. Lo hacemos desde la perspectiva jurídica, atendiendo los imperativos que correspondan a este campo.

## I

En cuanto a la neutralidad de nuestra Constitución nos parece propio señalar que cuando de ello se habla lo que se quiere decir es que la misma no impide que se abogue y labore por la estadidad o independencia. Las palabras del Presidente de la Comisión de Preámbulo, Ordenanzas y Procedimientos de Enmiendas a la Constitución citadas en la opinión disidente así lo expresan: *"no significa república, ni estado independiente, y separado; tampoco estado de la Unión"; "ni excluye ni implica la estadidad federada, la independencia separada u otra forma* de organizar política a que nos pueda conducir nuestra voluntad y destino". (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2555 y 2557 (1951). Ahora bien, afirmar que mediante la Constitución no se excluye la consecución de otras fórmulas de *status* político no es sinónimo de afirmar que la Constitución no está predicada en la existencia del Estado Libre Asociado. De hecho, el Preámbulo de la Constitución indica:

. . . *establecemos esta Constitución para el Estado Libre Asociado* que en el ejercicio de nuestro derecho natural ahora creamos dentro de nuestra unión con los Estados Unidos de

América. (Énfasis suplido.) Preámbulo, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 251.

Además, el Art. I de la Constitución declara:

*Se constituye el Estado Libre Asociado de Puerto Rico.* Su poder político emana del pueblo y se ejercerá con arreglo a su voluntad, *dentro de los términos del convenio acordado* entre el pueblo de Puerto Rico y los Estados Unidos de América. (Énfasis suplido.) Const. E.L.A., *supra*, Art. I, Sec. 1, pág. 252.

Es claro para nosotros que nuestra Constitución está predicada en la existencia del Estado Libre Asociado aun cuando ésta no impide que se trate de obtener para el país otra fórmula de *status*. Tal y como está, no es una Constitución propia para continuar vigente íntegramente si Puerto Rico fuere un estado federado o una república independiente. Es una Constitución que, aun cuando responde a una fórmula determinada de *status* político, permite la libre expresión y asociación, así como laborar por la consecución de los ideales que cada uno prefiera. Entendemos que la neutralidad apuntada en la opinión disidente acarrearía hasta la ilegalidad de utilizar fondos públicos para que el Gobierno del Estado Libre Asociado defendiera en los tribunales esa fórmula si su validez jurídico-constitucional fuere cuestionada. También podría acarrear la invalidez de la asignación de fondos públicos del país necesarios para hacer viable la extensión a Puerto Rico de programas económicos y sociales del Gobierno de EE.UU., pues podría válidamente argumentarse que la extensión de esos programas a Puerto Rico promueve la estadidad o la autonomía y es irreconciliable con el ideal de la independencia.[1] De igual modo, podría razona-

---

[1] Desde otra perspectiva, no jurídica, hemos argumentado que esos programas enervan los poderes autonómicos. Véase nuestro voto explicativo al In-

blemente argumentarse la invalidez de la asignación de fondos públicos al Comité Olímpico de Puerto Rico para que el país compita en los Juegos Panamericanos y en las Olimpíadas Mundiales contra EE.UU., bajo el fundamento de que ello promueve la separación e independencia y es irreconciliable con la estadidad. El efecto neto de esa tesis es constituir nuestra Constitución en camisa de fuerza que ahoga nuestro desarrollo como pueblo y fosiliza nuestras relaciones con EE.UU. dentro del Estado Libre Asociado. Hace nuestra Constitución anacrónica, y va contra todos los principios básicos de interpretación de constituciones como documentos de principios generales que permiten su adaptación a las necesidades cambiantes de la sociedad.

## II

De otra parte, no creemos correcta la disyuntiva[2] planteada de "democracia o partidocracia", pues no concebimos los partidos políticos como contrapuestos a la democracia. Los partidos políticos son consustanciales con nuestro sistema democrático y republicano de gobierno. *García Passalacqua v. Tribunal Electoral*, 105 D.P.R. 49, 69 (1976). Así se reconoce en el Art. II, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico al conferirse el derecho de representación a las minorías por conducto de los partidos políticos. Esa disposición constitucional ha sido reconocida como un gran adelanto en nuestro proceso electoral y cuando este Tribunal ha tenido oportunidad de interpretarla, lo ha hecho reconociendo la preeminencia de la representación de

---

forme del Comité Ad Hoc sobre el Desarrollo del Estado Libre Asociado de Puerto Rico, octubre de 1975, pág. 74.

[2] El planteamiento de "democracia o partidocracia" realmente contrapone un concepto al otro como si fueran contrarios. Véase *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, sobre el uso de la letra "o".

minorías por un partido político. De hecho, al reconocer este Tribunal el derecho a la representación por un partido político, resultó favorecido el aquí apelante Partido Independentista Puertorriqueño. *Fuster* v. *Busó*, 102 D.P.R. 327 (1974). No existe en nuestro sistema la disyuntiva planteada. Tampoco la configura la opinión del Tribunal.

La tesis de inconstitucionalidad se fundamenta, en parte, en que los participantes en el proceso primarista son partidos espurios. Este dato es inferido del señalamiento de que los participantes en las primarias no son partidos políticos *bona fide*, y que una "radiografía" de los mismos "concluyentemente demuestra que son unos álter ego —por así decirlo, un espejo— de los dos partidos políticos principales que controlan la mayoría representativa en las cámaras legislativas". Opinión disidente del Juez Asociado Señor Negrón García, pág. 655. Nos parece incorrecto afirmar a una misma vez, por un lado, que son álter ego o espejo de partidos *bona fide* y, por otro, que no son partidos *bona fide*. Entendemos que lo procedente a base de la conclusión de álter ego sería, utilizando la analogía corporativa, descorrer el velo. Esto es, reconocer que los partidos participantes no tienen vida propia, y que los verdaderos participantes son los partidos *bona fide* que dominan a los álter ego y proceder, en consecuencia, al análisis constitucional a base de la realidad y no de la ficción que se reconoce.

### III

No creemos que se pueda adoptar, sin más análisis que la reproducción de la propaganda partidista electoral, la premisa de que el proceso primarista sobre candidatos a las elecciones presidenciales en Estados Unidos promueve la estadidad o la autonomía y que es, en consecuencia, irreconciliable con el ideal de independencia. El reclamo partidista de ocasión no es base suficientemente sólida sobre la cual asen-

tar esa premisa. Es necesario examinar el asunto más a fondo. Adviértase que en Puerto Rico se han celebrado primarias presidenciales desde 1980 y hasta el presente éstas no han tenido el efecto de alterar apreciablemente el número porcentual de votantes por la independencia.

Obsérvese también que el Distrito de Columbia, aun cuando a partir de 1961 sus electores tienen el derecho a votar, y votan, por el Presidente y Vicepresidente, en virtud de la Enmienda XXIII de la Constitución de EE.UU., no es hoy día, 27 años después, un estado federado. Debe notarse que los lazos políticos, económicos y culturales del Distrito de Columbia con Estados Unidos son mucho más estrechos que los de Puerto Rico, y que allí también existe un movimiento político que aboga por su admisión a la unión como estado. Sobre este particular debe examinarse el Informe del Grupo Asesor Ad Hoc sobre el Voto Presidencial para Puerto Rico de 18 de agosto de 1971. Ese grupo asesor fue nombrado por el entonces Gobernador de Puerto Rico Hon. Luis A. Ferré y el Presidente de EE.UU. En el informe, *inter alia,* se señala en las págs. 44–45:

> Varios testigos argumentaron que el voto presidencial es un paso importante hacia la estadidad. Aducen que los ciudadanos en los 50 estados disfrutan del derecho a votar por el Presidente y el Vice-Presidente. Se les escapa el significado fundamental de la Enmienda XXIII, que extiende el derecho de voto presidencial a ciudadanos residentes en el Distrito de Colombia que no es un estado. Además, este argumento suena mucho como las predicciones de 1917 de que la ciudadanía de los Estados Unidos para los puertorriqueños significaría estadidad inmediata. Han pasado cincuenticuatro años; ni los temores ni las esperanzas de los vaticinadores se han materializado.

A nuestro juicio para que la premisa sea aceptable necesita un aval más sólido que los reclamos partidistas de ocasión. Las decisiones tácticas de todos los partidos políticos

han variado de tiempo en tiempo y continúan variando. Por ello esos reclamos no resultan base confiable para fundamentar nuestras determinaciones jurídicas.

—O—

Voto particular emitido por el Juez Asociado Señor Alonso Alonso.

El debate político sobre el *status* político de Puerto Rico no priva de fin público a la asignación de fondos públicos para administrar el proceso eleccionario de primarias presidenciales y el ejercicio del derecho constitucional de asociación, de libre participación en las decisiones colectivas y el derecho al voto. Sobre estos derechos fundamentales se apuntala la democracia puertorriqueña.

Todos los procesos de expresión, asociación política y su complemento, el derecho al voto, son manifestaciones fundamentales de una democracia que enmarcan dentro de nuestro esquema constitucional.

I

El Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico dispone que el sistema democrático es fundamental para la vida de la comunidad puertorriqueña, y que dicho sistema es aquel donde la voluntad del pueblo es la fuente del poder público y donde se asegura la libre participación del ciudadano en las decisiones colectivas.

La Carta de Derechos de nuestra Constitución dispone que "[n]o se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica" (Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 265) y que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito" (Art. II, Sec. 6, Const. E.L.A., *supra*, pág. 274). Además, establece que "[l]as leyes garantizarán la expresión de la vo-

luntad del pueblo mediante el sufragio universal ... y que protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral" (Art. II, Sec. 2, Const. E.L.A., *supra*, pág. 260).

La participación voluntaria de los ciudadanos en el proceso eleccionario de primarias presidenciales es el ejercicio válido de los derechos constitucionales antes expuestos.

## II

La Ley Núm. 6 de 24 de septiembre de 1979 (16 L.P.R.A. sec. 1321 y ss.) prohíbe el que los resultados de las primarias presidenciales se vinculen con la relación jurídico-política entre Puerto Rico y Estados Unidos. El Art. 32 de dicha ley, 16 L.P.R.A. sec. 1352, es diáfano al disponer:

> Siempre que los procedimientos de primarias presidenciales sean administrados e implementados desde su inicio hasta cumplimentación final por el Presidente de la Comisión Estatal de Elecciones, ni el número de los participantes, *ni los resultados de ningún otro elemento del proceso de las mismas y/o demás procedimientos que se lleven a tenor con lo dispuesto en este Capítulo podrá ser oficialmente interpretado por el Gobierno de Puerto Rico para propósito alguno como indicador en relación con las preferencias que tenga o pueda tener nuestro pueblo o un sector del mismo en cuanto al asunto del status político, ni en cuanto a la dirección, si alguna, por la cual deba o pueda encaminarse Puerto Rico en términos de cambios a su actual status.* (Énfasis suplido.)

Dicho artículo, adoptado por la Asamblea Legislativa en 1979, un año después de este Tribunal resolver el caso de *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590 (1978), salva las preocupaciones constitucionales allí expresadas.

El hecho de que los partidos políticos, sus líderes, miembros o personas, en su propaganda y expresiones públicas sostengan lo contrario no altera la letra clara de la ley.

## III

Nada hay en la Constitución, en la Ley de Primarias Presidenciales Compulsorias, en la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3001 y ss., y en sus disposiciones sobre el Fondo Electoral, 16 L.P.R.A. sec. 3114 y ss., que impidan al apelante P.I.P., y a otros partidos políticos o asociaciones que no tienen franquicia electoral, el hacer campaña y propaganda en contra de las primarias presidenciales.

El diálogo público y la diversidad de ideas ayudan al puertorriqueño a formar sus propios juicios sobre su participación en las primarias presidenciales. Ello fortalece la democracia puertorriqueña y adelanta los postulados constitucionales.

Al darle virtualidad a estos derechos constitucionales no nos estamos lavando las manos señalando que la controversia ante nos es una cuestión política (*political question*). Tampoco estamos abdicando nuestra función judicial.

## IV

Sostengo que toca *a este Tribunal*, en última instancia, determinar si el proceso eleccionario de primarias presidenciales tiene un fin público y si es válida la asignación de recursos del Estado para implantar la reglamentación sobre ese particular. Ello no es prerrogativa exclusiva de la Asamblea Legislativa o del Ejecutivo. "[L]os cuerpos legislativos no pueden convertirse en los jueces constitucionales de sus propios poderes. Es a los tribunales a quienes les toca interpretar . . . la Constitución." *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750, 760 (1977), y *Silva* v. *Hernández Agosto*, 118 D.P.R. 45 (1986).

El análisis que hemos hecho de la controversia ante nos, me convence de que existe un fin público y que la asignación de recursos del Estado es válida.

## V

Contrario a lo insinuado por el compañero Juez Asociado Señor Negrón García, en la controversia que estamos analizando puede haber válidas diferencias de criterio. Así sucedió ya al resolver en 1980 el caso de *P.I.P.* v. *E.L.A.*, 109 D.P.R. 403 (1980), cuando los distinguidos Jueces que componían este Tribunal asumieron distintas posiciones fundamentadas en diversas teorías de derecho. Como cuestión de hecho, la posición asumida por el Juez Asociado Señor Negrón García fue adoptada sólo por un magistrado, que se unió a él en su voto disidente en *P.I.P.* v. *E.L.A.*, supra.

Tal trasfondo fáctico e histórico hacen inexplicable sus desafortunadas expresiones sobre esta institución y los actuales jueces de este Tribunal.

## VI

Por los fundamentos aquí expuestos y los vertidos en la opinión del Tribunal, con la cual estoy conforme, uno mi voto para confirmar la sentencia del tribunal de instancia.